IN the MATTER OF the GUARDIANSHIP OF JUDY K.:

DUNN COUNTY, Petitioner-Appellant,

v.

JUDY K., Respondent-Respondent.

Supreme Court

*No. 00–3135. Oral argument March 7, 2002.—Decided July 3, 2002.*

2002 WI 87

(Also reported in 647 N.W.2d 799.)

For the petitioner-appellant there were briefs and oral argument by *Nicholas P. Lange,* assistant corporation counsel.

For the respondent-respondent there were briefs by *Roy W. Froemming, Mitchell M. Hagopian* and the *Wisconsin Coalition for Advocacy, Inc.,* Madison, and

*James T. Parent* and *Burgfechtel & Parent,* Menominee, and oral argument by *Mitchell M. Hagopian.*

An amicus curiae brief was filed by *Robert Theine Pledl* and *Schott, Bublitz & Engel, S.C.,* Brookfield, on behalf of the Wisconsin Coalition of Independent Living Centers.

An amicus curiae brief was filed by *Ellen J. Henningsen,* Madison, on behalf of the Elder Law Center of the Coalition of Wisconsin Aging Groups.

An amicus curiae brief was filed by *John J. Prentice, Andrew T. Phillips* and *Prentice & Phillips LLP,* Milwaukee, on behalf of the Wisconsin Counties Association.

¶ 1. ANN WALSH BRADLEY, J. This case is before the court on certification pursuant to Wis. Stat. § (Rule) 809.61 (1999–2000).[1] Dunn County appeals from an order requiring the County to take affirmative steps to seek funding to support the cost of Judy K.'s protective placement and to develop community-based placement resources appropriate for Judy K.[2] The County asserts that under Wis. Stat. § 55.06(9)(a), it cannot be required to contribute any funds to Judy K.'s placement costs. We disagree and conclude that the County is required to make an affirmative showing of a good faith, reasonable effort to find and fund an appropriate placement in accordance with the factors outlined in § 55.06(9)(a). Because the County failed to make such a showing at the time of the final hearing on placement, we affirm the circuit court's order.

---

[1] All subsequent references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise indicated.

[2] Dunn County appealed from an order of the Circuit Court for Dunn County, William C. Stewart, Judge.

¶ 2. Judy K. is a 56–year-old developmentally disabled woman. While living in a supervised apartment setting through Aurora Residential Alternatives, she began experiencing deterioration in her walking ability. She fell eleven times and sustained a severe head injury as a result of one of her falls. Dunn County filed a petition requesting that she be protectively placed.[3]

¶ 3. Before the final hearing on the petition could be held, Judy K. was transferred to the Trempealeau County Health Care Center pursuant to an emergency placement order. At the hearing on permanent placement, the parties stipulated to a finding of the need for placement, and the circuit court received evidence in support of the finding. Judy K.'s adversary counsel, her guardian, and her guardian ad litem all indicated that issues remained with respect to whether the Trempealeau County Health Care Center was the least restrictive environment appropriate for Judy K.

¶ 4. The circuit court found that as of the hearing date, the parties were unaware of appropriate alternatives for placement. Accordingly, the court ordered further assessment of Judy K. and the preparation of placement proposals. The court set a date for a continued hearing approximately two and one-half months later.

¶ 5. At the continued hearing, the County conceded that at least two of the proposed placement options were appropriate for Judy K. and less restrictive. However, its position was that Judy K. should

---

[3] Judy K. previously had been the subject of a protective placement that was vacated because she was at the time living in the least restrictive environment capable of meeting her needs.

remain at the Trempealeau County Health Care Center where there was no additional cost to the County. Judy K.'s guardian ad litem and adversary counsel advocated for a placement proposal that Judy K. reside in a Hudson facility through Community Living Specialists.

¶ 6. The circuit court reserved a final decision, ordered briefing, and conducted an evidentiary hearing approximately one week later. Dennis Ciesielski, the long-term support supervisor with the County's Department of Human Services, testified at the hearing.

¶ 7. Ciesielski explained that Judy K. received funding through the CIP IA program,[4] and that when she was in a supervised apartment setting at Aurora, the cost was $125.57 per day, which represented a consolidation of county, state, and federal funds. The $125.57 included $125.00 of federal and state dollars. The remaining $0.57 was comprised of county funds and additional federal funds at a ratio of approximately

---

[4] The Legislative Fiscal Bureau's Informational Paper #50, titled "Services for Persons with Developmental Disabilities" and dated January, 2001, provides useful background on the CIP IA program. Page nine of the Paper explains as follows:

> Federal law authorizes the U.S. Department of Health and Human Services, Health Care Financing Administration to waive certain MA [Medical Assistance] requirements to enable states to provide home- and community-based services to persons who would otherwise require care in an institution. In Wisconsin, there are six such programs that operate under four MA waivers: (1) the community integration program IA (CIP IA); (2) . . . .

According to the Legislative Fiscal Bureau's Informational Paper #43, "Medical Assistance and BadgerCare," at page 44, the four waiver programs "are intended to reduce the number of persons who would receive long-term care services in nursing homes or institutions."

41% to 59%.[5] Thus, the County's contribution was approximately $0.24 per day.

¶ 8.    In addition, Ciesielski stated that the County was unwilling to place Judy K. in a setting that would cost more than $125.57 per day. He acknowledged that the Hudson facility currently was the only facility that would provide the least restrictive placement for Judy K. The average daily cost for the Hudson facility was $224.22 per resident. When asked if an appropriate placement for $125.57 was viable, Ciesielski responded that he could not say without further study.

¶ 9.    The circuit court subsequently ordered that Judy K. be transferred to the Hudson facility. In addition, the court required the County to take affirmative steps to seek additional federal, state, local, or other funding to support the cost of Judy K.'s placement. Finally, the court ordered the County to develop community-based placement resources appropriate for Judy K. and others on a County waiting list.

¶ 10.    The County appealed, arguing that Judy K. should have been permanently placed in the Trempealeau County Health Care Center because no community placements were available within the limits of state and federal funds and county funds required to be appropriated to match state funds. Section 55.06(9)(a) provides in part: "The county may not be required to provide funding, in addition to its funds that are required to be appropriated to match state funds, in order to protectively place an individual." Based on this statutory language, the County asserted that the amount of County funds required under the statute for Judy K.'s placement was zero.

---

[5] Ciesielski in his testimony referred to figures of 42% and 58%, although Legislative Fiscal Bureau sources cited by Judy K. indicate that the ratio is 41% to 59%. For purposes of our review, the precise rate is not important.

¶ 11. The court of appeals certified the County's appeal to this court. It interpreted the circuit court's decision to place three affirmative obligations on the County: (1) to exhaust all potential additional sources of federal funding to support placement in the least restrictive environment; (2) to exhaust all potential sources of increased state funding; and (3) to affirmatively seek to develop additional community-based placements within the constraints of state and federal funding.

¶ 12. In addition, the court of appeals noted that § 55.06(9)(a) recently was amended by 1995 Wis. Act 92 and that "several other appeals had been commenced in [the court of appeals] challenging protective placements on the ground that they exceed the spending limits authorized by 1995 Wis. Act 92." We accepted certification, and the County renews its arguments here.

II

■

¶ 13. The question we address is whether in a protective placement pursuant to § 55.06(9)(a), a county may be required to make affirmative efforts to find and fund an appropriate placement. This requires the interpretation and application of a statute, a question of law subject to independent appellate review. *Waukesha County v. Steven H.*, 2000 WI 28, ¶ 16, 233 Wis. 2d 344, 607 N.W.2d 607. The legal backdrop for this question is set by a decision of this court and subsequent legislative action.

¶ 14. In *D.E.R. v. La Crosse County*, 155 Wis. 2d 240, 242, 455 N.W.2d 239 (1990), the court addressed whether the circuit court erred in failing to order placement for two developmentally disabled persons in the least restrictive environment, as required by Wis.

Stat. § 55.06(9)(a) (1987–88), on the sole ground of lack of funding. The court concluded that the legislature did not intend to limit a county board's duty to fund protective placements under ch. 55 to the funds the county receives in state and federal funding and the funds the county appropriates to match state funds. *Id.*

¶ 15. In support of its conclusion, the court observed that there was no provision in ch. 55 that required the circuit court to consider the availability and source of funds when placing an individual in the least restrictive environment. *D.E.R.,* 155 Wis. 2d at 248. Rather, the court explained, "the factors enumerated in sec. 55.06 for consideration in making protective placement, although not all inclusive, relate to the individual only—the needs of the person to be protected and the level of supervision—and do not refer to appropriations by the county board of supervisors." *Id.*[6]

¶ 16. Subsequently, the legislature amended several provisions in ch. 55 and Wis. Stat. ch. 51 to include language that provides a limitation on a county's financial responsibility for certain services under these chapters. *See* 1995 Wis. Act 92. Before it was amended by Act 92, § 55.06(9)(a) (1987–88) provided, in part, as follows:

> When ordering placement, the court, on the basis of the evaluation and other relevant evidence shall order placement through the appropriate board designated under s. 55.02 or an agency designated by it. *Placement shall be made in the least restrictive environment con-*

---

[6] Shortly after *D.E.R. v. La Crosse County,* 155 Wis. 2d 240, 455 N.W.2d 239 (1990), the court of appeals held that a county's obligation to place developmentally disabled individuals in the least restrictive environment applied even where the type of community placement sought did not already exist. *See Fond du Lac County v. J.G.S.,* 159 Wis. 2d 685, 687, 465 N.W.2d 227 (Ct. App. 1990).

*sistent with the needs of the person to be placed. Factors to be considered in making protective placement shall include the needs of the person to be protected for health, social or rehabilitative services and the level of supervision needed.*

(Emphasis added.) Section 55.06(9)(a) now provides, in part:[7]

When ordering placement, the court, on the basis of the evaluation and other relevant evidence shall order the appropriate board specified under s. 55.02 or an agency designated by it to protectively place the individual. Placement by the appropriate board or designated agency *shall be made in the least restrictive environment consistent with the needs of the person to be placed and with the placement resources of the appropriate board specified under s. 55.02.*

*Factors to be considered in making protective placement shall include the needs of the person to be protected for health, social or rehabilitative services; the level of supervision needed; the reasonableness of the placement given the cost and the actual benefits in the level of functioning to be realized by the individual; the limits of available state and federal funds and of county funds required to be appropriated to match state funds; and the reasonableness of the placement given the number or projected number of individuals who will need protective placement and given the limited funds available.*

*The county may not be required to provide funding, in addition to its funds that are required to be appropriated to match state funds, in order to protectively place an individual.*

(Emphasis added.)

---

[7] The excerpted portions of Wis. Stat. § 55.06(9)(a) appear in one continuous paragraph in the official version of the statutes, but we have broken that paragraph into several for ease of reading.

¶ 17. The County asserts that under the amended version of the statute, it cannot be required to contribute any funds to the cost of Judy K.'s placement. Thus, under the County's position, its financial obligation to fund the daily cost of protective placements like Judy K.'s is zero, and even the $0.24 per day it previously provided was gratuitous.

¶ 18. We reject the County's interpretation of the statute because it cannot account for the language in § 55.06(9)(a) referring to county funds that are "in addition to its funds that are required to be appropriated to match state funds." Also, the County's interpretation fails to account for the multi-factor approach to placement in the statute and the individual liberty interests that are recognized by the statutory scheme.

¶ 19. When the legislature inserted language explaining that a county cannot be required to provide funding "*in addition to* its funds that are required to be appropriated to match state funds," it must have intended that county funds "required to be appropriated to match state funds" refer to something. Section 55.06(9)(a) (emphasis added). The County maintains that the legislature was referring only to community aids funding.[8]

---

[8] The Legislative Fiscal Bureau's Informational Paper #48, "Community Aids," dated January, 2001, begins with this explanation:

> Community aids are state and federal funds which are distributed by the Department of Health and Family Services (DHFS) to counties for the provision of human services in two broad, statutorily-defined areas: (1) social services for low-income persons and children in need of protection and services; and (2) services for persons with needs relating to mental illness, substance abuse or developmental disabilities.

¶ 20. The County, however, is able to offer no explanation of how it is that county dollars directed to community aids funds are "required to be appropriated to match state funds" any more than are county dollars that might be used to match funds available through the CIP IA program. During oral argument, the County conceded that county money directed toward community aids is "required to be appropriated to match state funds" in the sense that if a county does not appropriate community aids monies, it foregoes state and federal community aids matching funds. Other matching-type funding programs may be required similarly in the sense that there is a "carrot" but no "stick." Accordingly, we reject the County's argument that the language in § 55.06(9)(a) referring to county funds "required to be appropriated to match state funds" must be intended to refer only to community aids funds.

¶ 21. In addition, the County's interpretation of the statute fails to account for the multi-factor statutory scheme and the individual liberty interests at stake that this scheme recognizes. Section 55.06(9)(a) as amended lists several factors to be considered in making a protective placement, many of which implicate financial considerations. Unquestionably, § 55.06(9)(a) now indicates that the availability of funds must be considered in an individual protective placement decision, and the statute also provides a limitation on county financial liability.

¶ 22. Nonetheless, the statute retains the previous version's factors of "the needs of the person to be protected" and "the level of supervision needed." Also, it retains the mandate that placement "shall be made in the least restrictive environment consistent with the needs of the person to be placed," although it now states

that the placement should be "consistent with . . . the placement resources of the appropriate board . . . ."[9]

¶ 23. The statute's continued recognition of the concept of least restrictive environment and its concern with the needs of the placed individual recognize the individual liberty interests at stake. A protective placement has many effects on an individual, including "loss of liberty, adverse social consequences, [and] intrusion on personal security." *State ex rel. Watts v. Combined Cmty. Servs. Bd.*, 122 Wis. 2d 65, 81, 362 N.W.2d 104 (1985). In reaching its holding that protectively placed individuals have a constitutional right to periodic judicial review of the placement, the court in *Watts* emphasized the inherent problems in allowing county financial interests to be the only factor in placement. The court explained:

> [T]he responsible protective services agency may be influenced in its decision making by the economics of

---

[9] The legislature amended other provisions similarly in Wis. Stat. ch. 55. Section 55.001 now provides that protective services:

> should, to the maximum degree of feasibility under programs, services and resources that the county board of supervisors is reasonably able to provide within the limits of available state and federal funds and of county funds required to be appropriated to match state funds, allow the individual the same rights as other citizens, and at the same time protect the individual from exploitation, abuse and degrading treatment.

Similarly, Wis. Stat. § 55.045 now provides:

> The appropriate county department designated under s. 55.02 shall, within the limits of available state and federal funds and of county funds required to be appropriated to match state funds, provide for the reasonable program needs of persons who are protectively placed or who receive protective services under this chapter, including reasonable expenses for the evaluations required by s. 55.06(8).

the placement. If the person remains in the nursing home, this is cost free to the county. If the person is in a county operated nursing home, there may be pressure not to remove a person due to possible loss of revenue for the facility. If the person is sent from a nursing home, there may be a necessity for the state and county to purchase community services.

*Watts,* 122 Wis. 2d at 78. The court's holding in *Watts* was reaffirmed just last term in *County of Dunn v. Goldie H.,* 2001 WI 102, ¶ 28, 245 Wis. 2d 538, 629 N.W.2d 189.

■

¶ 24. The consequences of the County's arguments run contrary to the multi-factor approach to placement prescribed by § 55.06(9)(a) and to the liberty interests that must, according to *Watts,* be shielded from incentives pressuring counties to make financial considerations the sole factor in placement. The County interprets the statute to provide essentially that it has no responsibility to provide funds. Its interpretation disregards "the needs of the person to be protected" and disregards "the level of supervision needed." The County's interpretation of the statute would also allow it to provide zero funds without regard to what is the "least restrictive environment."

¶ 25. Under the County's position, the multi-factor approach in the statute is transformed into a one-factor approach in which that one factor is that the County be free not to contribute any funds to a particular placement. Moreover, in cases where all possible placement alternatives would cost some county funds, the court would be unable to order any placement whatsoever.

¶ 26.   Although we reject the County's interpretation of § 55.06(9)(a), we recognize that the language of the statute indicates that the legislature intended that the availability of funds be considered in protective placement decisions. The purpose of the statutory language that the County "may not be required to provide funding, in addition to its funds that are required to be appropriated to match state funds" is clear: it provides a limitation on county financial liability. The statute gives the County a defense against being compelled in an individual placement to contribute funds "in addition to its funds that are required to be appropriated to match state funds."

¶ 27.   Our goal must be to implement the legislative intent while also preserving the statutory scheme and continuing to recognize the liberty interests of protectively placed individuals. The County's interpretation of the statute does not achieve this goal. However, the circuit court's decision that the County take affirmative steps to seek additional funds and to develop an appropriate community-based placement for Judy K. does. In order to ensure that counties utilize available funds but are not forced to contribute funds in addition to required funds, we agree with the circuit court that the counties must bear the burden of showing whether funds are available and whether appropriate placements may be developed within the limits of required funds.

¶ 28.   We therefore determine that in protective placements pursuant to § 55.06(9)(a), counties must make an affirmative showing of a good faith, reasonable effort to find an appropriate placement and to secure funding to pay for an appropriate placement. Put more

399

succinctly, the county must show it has made a good faith, reasonable effort to find and fund an appropriate placement.

■

¶ 29. The determination of what is an appropriate placement depends upon the application of all the factors outlined in § 55.06(9)(a). At the same time, the statute provides a limitation on a county's ultimate financial liability: "'The county may not be required to provide funding, in addition to its funds that are required to be appropriated to match state funds, in order to protectively place an individual.'"[10]

---

[10] The facts and posture of this case do not require that we determine all possible sources of funds encompassed by this statutory language. Thus, we need not determine today exactly what funds are "required to be appropriated to match state funds." This question, however, is answered implicitly by the dissent. The dissent assumes, in apparent agreement with the County, that the language "funds that are required to be appropriated to match state funds" applies only to county funds required to match community aids. It is by making this assumption that the dissent can reach its incorrect conclusion that our decision requires the County "to spend *more* money . . . than 'the limits of available state and federal funds and of county funds required to be appropriated to match state funds.'" Dissent at ¶ 58.

While it is laudable that most counties provide community aids "overmatch," *see* dissent at ¶ 64, this does not answer the question of what funds are "required to be appropriated to match state funds" in an individual protective placement. The dissent apparently agrees with the County that its funding obligations in any given placement may be zero because it has made the only required match via community aids funds.

¶ 30. The find and fund standard will help ensure that protective placements comport with the multi-factor statutory scheme, which recognizes the needs and rights of placed individuals as well as the significant role that counties play in the protective placement system. Placing the burden on the counties to show a good faith, reasonable effort to find and fund also makes sense because the counties' substantial responsibility in the protective placement system means they are the repository of much of the information and other resources pertinent to funding and placement.

¶ 31. In contrast, individuals subject to protective placement are not in a position to know what funding sources might be available. Those individuals do not know whether appropriate placements may be located, created, or funded through a good faith, reasonable effort. Similarly, the court making the protective placement determination has no inherent way of knowing whether appropriate placements or funds are available.

¶ 32. An affirmative obligation on the County to show efforts to find and fund also serves to recognize the liberty interests at stake and embodied in the statutory scheme. It honors the dictates of *Watts,* and ensures that counties do not make decisions based solely on financial considerations when placement needs can be met through a good faith, reasonable effort. At the same time, however, the find and fund standard recognizes that resources are not limitless and that counties carry a substantial burden in meeting the needs of individuals subject to protective placements.

¶ 33. Indeed, this case serves as an illustration that the legislature's intent to provide a limitation on county financial liability while recognizing the needs

and interests of those who are protectively placed can be well served by an affirmative obligation on the counties to find and fund. At oral argument, counsel for the County explained that the County ultimately was able to obtain additional personal care funds for Judy K. through Medical Assistance. Counsel further explained that even though Judy K. was in a·community setting pursuant to court order, "the cost is actually quite low at this time." The annual cost to the County was estimated by counsel to be $600.

■

¶ 34.  In contrast, the record before us does not support a determination that the County, at the time of the final hearing on permanent placement, had made a good faith, reasonable effort to find and fund an appropriate placement for Judy K. At that hearing, Dennis Ciesielski, the County's long-term support supervisor with its human services department, gave testimony suggesting that the County's decision with regard to Judy K.'s placement was based solely on financial considerations:

Q Mr. Ciesielski, the one—the $125.57—or $125.57 per diem rate, it's my understanding that's the amount that the County will not pay greater than, correct?

A Correct.

Q At the present time anyway.

A That is correct.

Q Okay. And that number was established solely based upon the amount it had paid prior to the protective placement?

A Prior to her placement at the health care center?

Q Yes.

A Yes.

Q And that's the only basis upon which that 125.57 number was reached, true?

A That is the figure we reached based on our fiscal situation, yes. Our decisions are based on our Department's financial situation.

¶ 35. Ciesielski testified similarly upon questioning by the Court, also seeming to indicate that the County had a blanket rule to deny funding regardless of individual circumstances or the potential for funding in individual cases:

THE COURT: So going back to that 125.57 cent per day that the County is willing to make available for Judy K.'s placement, is essentially what you're telling me that the County at this time is either unwilling or unable to utilize County dollars, except to the extent they might have to deal with this 57 cents for the least restrictive placement of Judy K.?

THE WITNESS: Yes, your honor.

THE COURT: And is that a determination you have made?

THE WITNESS: Based on the guidance and direction given to us by our County Board.

THE COURT: And they have directed you essentially not to spend County funds on placements in CIP 1 A cases?

THE WITNESS: Among other cases, your Honor.

¶ 36. Finally, Ciesielski explained the efforts the County had made to fund Judy K.'s placement consisted only of general lobbying of its representatives in the legislature for increased state appropriations:

403

THE COURT: What affirmative efforts have been made by the Department since July of this year?

THE WITNESS: I guess I would have to say, your Honor, it comes down to, for want of a better term, politics in that it is approaching our legislatures [sic] to help them recognize the long waiting list that exists in Dunn County, among many other counties, and that we only have three funding sources, and that recognizing the position of Dunn County, it is helping the State hopefully to understand that to eliminate the waiting list there is a need for the State to take a greater responsibility in providing funding to meet the needs of the individuals on our waiting list.

THE COURT: Okay. But I'm just talking about the federal government now. And I guess my question is, have any efforts been made to attempt to, with regard to Judy, expand the potential federal funding to support her community placement? Yes or no, since July of this year.

THE WITNESS: We have—I'm not sure if I fully understand. But if you're saying have we directed a very specific effort to the State or federal government on behalf of Judy K. and Judy K. alone, I would say no.

¶ 37. Based on this and other testimony by Ciesielski, in addition to other evidence, the circuit court made a number of findings of fact. Those findings included that:

Appropriate, less restrictive community-based placements for Judy K[ ] could be developed and available through independent providers in the community, that meet the ward's needs, at a daily rate of not in excess of $125.57 but the Department has not made efforts to develop such sites.

The Department has not taken any affirmative steps since July of 2000, to secure additional federal, state or county funds to support a placement of Judy K[ ] in the

least restrictive placement possible, in the community, in excess of the authorized $125.57.

There is no indication in the record the Department is currently undertaking any efforts to seek an appropriate, least restrictive placement for Judy K[ ] in the community at a rate of $125:57.

██

¶ 38.   We defer to the circuit court's findings of fact unless they are unsupported by the record and therefore clearly erroneous. *Schreiber v. Physicians Ins. Co.,* 223 Wis. 2d 417, 426, 588 N.W.2d 26 (1999). Here, the court's findings are well supported by the record, and the evidence leads to the conclusion that the County failed to show that it made a good faith, reasonable effort to find and fund an appropriate placement for Judy K.

¶ 39.   Because we reject the County's interpretation of § 55.06(9)(a) to provide that it need not contribute any funds to Judy K.'s placement, and because we also conclude that the County failed to show that it made a good faith, reasonable effort to find and fund an appropriate placement for Judy K. at the time of the final hearing on placement, we do not grant the primary relief the County seeks: a remand to the circuit court for entry of an order that Judy K. be placed at the Trempealeau County Health Care Center.

¶ 40.   Nonetheless, we must briefly address the breadth of the circuit court's order in light of our decision. In addition to ordering that Judy K. be transferred to a community-based setting and that the County take affirmative steps to seek additional funding to support the cost of Judy K.'s placement, the court ordered the County to develop community-based placement resources appropriate for others on a County waiting list.

¶ 41. Section 55.06(9)(a) calls for an individualized determination of placement. Nothing in that statute gives the circuit court authority to order action on the placement of other individuals who are not before it. To the extent the court's order required the County to act on cases other than Judy K.'s, it went beyond the issue before it. The only placement before the court was Judy K.'s. Accordingly, although we affirm the circuit court's order, we limit its effect to Judy K.'s case.[11]

### III

¶ 42. In sum, we conclude that the County is required under § 55.06(9)(a) to make an affirmative showing of a good faith, reasonable effort to find and fund an appropriate placement in accordance with the factors outlined in the statute. Because the County failed to make such a showing at the time of Judy K.'s placement hearing, we affirm the circuit court's order. However, we limit the effect of the order to Judy K., the case that was before the circuit court.

*By the Court.*—The order of the circuit court is affirmed.

¶ 43. DAVID T. PROSSER, J. *(dissenting).* Many

---

[11] Because we affirm the circuit court's order to the extent it provided relief specific to Judy K., we need not reach her arguments as to the constitutionality of § 55.06(9)(a) or its interaction with the Americans with Disabilities Act.

In addition, we need not remand this case for a determination on placement. The parties at oral argument acknowledged that Judy K. was presently in a community placement pursuant to the circuit court's order. Judy K.'s placement, like all ch. 55 placements, is subject to annual review. *See State ex rel. Watts v. Combined Cmty. Servs. Bd.,* 122 Wis. 2d 65, 84, 362 N.W.2d 104 (1985).

of our citizens need protective services. Children who have been abused, neglected, or abandoned by parents need protective services. The aged infirm, incapacitated mentally or physically by the degenerative process of old age, need protective services. Men and women who are mentally ill, dependent on alcohol or drugs, or homeless and without food need protective services.

¶ 44. Developmentally disabled persons, defined in Wis. Stat. § 55.01(2) as individuals "having a disability attributable to mental retardation, cerebral palsy, epilepsy, autism or another neurological condition closely related to mental retardation," are especially needy. Their disabilities make them vulnerable to exploitation, and their conditions usually continue indefinitely. When the developmentally disabled are so totally incapable of providing for their own care or custody as to create a substantial risk of serious harm to themselves or others, they are subject to involuntary placement under Chapter 55. Wis. Stat. § 55.06.

¶ 45. Historically, human needs have outpaced government resources. Human services must compete for funding with other worthy causes such as education, public safety, and the natural environment. In this milieu, citizens organize to promote their preferences. When they do not achieve their goals, they sometimes turn to the judiciary, hoping to win in court what they have been unable to secure in the legislature. *Vincent v. Voight,* 2000 WI 93, 236 Wis. 2d 588, 614 N.W.2d 388, is a case in point.

¶ 46. Advocates for the developmentally disabled are among those who have used litigation to gain their objectives. Twelve years ago, these advocates attempted to compel additional expenditures by Wisconsin coun-

ties for the developmentally disabled.[1] Their vehicle was a case from La Crosse County, in which a circuit judge had declined to order the transfer of two developmentally disabled persons from the Northern Wisconsin Center to facilities in the community. *D.E.R. v. La Crosse County,* 155 Wis. 2d 240, 455 N.W.2d 239 (1990). The circuit court concluded that the county had fulfilled its statutory duty by funding protective placements with moneys the county had received from the state and federal governments and with moneys the county had appropriated as matching funds. *Id.* at 242.

¶ 47. This court responded with a historic decision. The issue, we said, was whether the circuit court erred in refusing to order placements in the least restrictive environments under Wis. Stat. § 55.06(9)(a) "on the sole ground that the county had fulfilled its statutory duty by funding protective placements with moneys the county receives from the federal and state governments and with moneys the county appropriates as matching funds." *Id.* at 246. The court responded that "the legislature did not intend to limit the county board's duty to fund protective placements under ch. 55 to the funds the county receives in state and federal funding and the funds the county appropriates to match state funds." *Id.* at 242. The court explained that:

> The legislature has not expressly limited the county's responsibility in ch. 55 to make placements to the least restrictive environment to funds available from state or federal sources and county matching funds. *Nothing in ch. 55 indicates that the funding limitations of secs. 51.42 and 51.437 apply to protective placements under sec. 55.06.*

---

[1] The legislature has assigned to county boards the primary responsibility for the care of the mentally ill, developmentally disabled, and substance abusers residing in their counties. Wis. Stat. § 51.42(1)(b).

*Id.* at 252 (emphasis added).

¶ 48. The court's opinion carefully analyzed the existing statutes and turned aside the county's statutory interpretation.

¶ 49. The county relied on a phrase—"to the maximum degree of feasibility"—contained in the legislative declaration of policy for Chapter 55. It argued that this language meant that practical financial considerations limit the circuit court's discretion to order placements in the least restrictive environment. *Id.* at 247. The court disagreed, asserting that: "We cannot find a legislative statement in sec. 55.001 or any other provision in ch. 55 that requires the circuit court to consider the availability and source of funds when placing an individual in the least restrictive environment." *Id.* at 248.

¶ 50. The county argued that the funding restraints under Chapter 51 apply with equal force to protective placements made pursuant to Chapter 55. *Id.* at 250. The court disagreed. It observed that sections 51.42(3)(ar)4 and 51.437(4m)(a) both used the phrase "within the limits of available state and federal funds and of county funds appropriated to match state funds," *id.* at 250–51, but that "neither ch. 51 nor ch. 55 expressly applies the ch. 51 funding limitations to ch. 55 protective placements." *Id.* at 251. "Nothing in ch. 55 indicates that the funding limitations of secs. 51.42 and 51.437 apply to protective placements under sec. 55.06." *Id.* at 252.

¶ 51. Responding to the county's fiscal arguments, the court acknowledged that the county and its taxpayers may suffer a significant financial burden when the state mandates county action and fails to provide funds adequate to carry out the mandate. *Id.* at 253–54. *"The counties must, however, look to the legislature, not the courts, for relief when the fiscal burdens created by legislative mandates become onerous." Id.* at

254 (emphasis added). "We conclude that the legislature did not intend to limit the county board's duty to fund protective placements in the least restrictive environment under ch. 55 to the funds the county receives in state and federal funding and the funds the county appropriates in matching funds." *Id.* at 255.

¶ 52. In 1995 the legislature enacted 1995 Wis. Act 92 (the Act) in direct response to the *D.E.R.* decision. The Legislative Reference Bureau Analysis of 1995 Assembly Bill 244, which became the Act, refers to the *D.E.R.* case by name and states that "the bill prohibits requiring a county to provide funding in addition to its funds required to match state funds, to protectively place a person."[2] 1995 Wis. Act 92 addresses the *D.E.R.* decision point by point.

¶ 53. First, the Act firmed up the funding limitations in Chapter 51, strengthening the provisions in Wis. Stat. §§ 51.42(3)(ar)4 and 51.437(4m)(a) and adding new language to Wis. Stat. §§ 51.001(1), 51.42(1)(b), 51.437(4)(a), and 51.61(1)(e).

¶ 54. Second, the Act borrowed the exact limiting language cited by this court from Chapter 51 and placed it in three different sections of Chapter 55: Wis. Stat. §§ 55.001, 55.06(9)(a), and 55.045. One of these sections is the "Declaration of Policy" referenced in the *D.E.R.* opinion. Wis. Stat. § 55.001.

---

[2] The Legislative Reference Bureau analysis specifically points out that under the court's decision in *D.E.R. v. La Crosse Co.,* 155 Wis. 2d 240, 455 N.W.2d 239 (1990), a county could be "required to provide funding in addition to federal, state and matching county funds" in order to protectively place a person. *See* Legislative Reference Bureau Drafting File for 1995 Wis. Act 92, *Analysis by the Legislative Reference Bureau* of 1995 A.B. 244 at 1.

¶ 55. Third, the Act amended the specific provision litigated in *D.E.R.*, Wis. Stat. § 55.06(9)(a). This subsection now reads in relevant part:

> Factors to be considered in making protective placement shall include the needs of the person to be protected for health, social or rehabilitative services; the level of supervision needed; *the reasonableness of the placement given the cost and the actual benefits in the level of functioning to be realized by the individual; the limits of available state and federal funds and of county funds required to be appropriated to match state funds; and the reasonableness of the placement given the number or projected number of individuals who will need protective placement and given the limited funds available. The county may not be required to provide funding, in addition to its funds that are required to be appropriated to match state funds, in order to protectively place an individual.*

Wis. Stat. § 55.06(9)(a) (emphasis added). The emphasized portion of the subsection is the language added by 1995 Wis. Act 92.

¶ 56. These provisions echo the precise concerns articulated in the *D.E.R.* decision. In short, counties took their cue from this court and looked to the legislature for relief. The legislature responded to the court's opinion almost word for word and provided the relief requested.

¶ 57. The legislative history of 1995 Assembly Bill 244 supports the plain, unambiguous language of the Act. Opponents of the proposed funding limitations offered amendments to the bill seeking to insert a reasonableness standard in lieu of a funding limitation.[3] These amendments were rejected.

[3] In a letter calling for amendments, the Wisconsin Coalition For Advocacy states: "AB 244 makes cost to counties *an*

¶ 58.   The majority opinion professes not to understand the intended effect of the legislature's clear language. It devises a new rule: "[T]he County is required to make an affirmative showing of a good faith, reasonable effort to find and fund an appropriate placement in accordance with the factors outlined in § 55.06(9)(a)." Majority op. at ¶ 1. It opines that Dunn County failed to make such a showing at the time of the final hearing on placement, and thus affirms the circuit court's order requiring the County to spend *more* money on protective placements than "the limits of available state and federal funds and of county funds required to be appropriated to match state funds." *Id,* at ¶¶ 1, 42. It fudges on the proposition that the sentence, "The county may not be required to provide funding, in addition to its funds that are required to be appropriated to match state funds, in order to protectively place an individual," is a defense against a court order that requires spending more money.

¶ 59.   What does "a good faith, reasonable effort to . . . fund an appropriate placement in accordance with the factors outlined in § 55.06(9)(a)" mean? In Wis. Stat. § 55.06(9)(a), the sentence limiting a county's duty to provide funding is not a listed factor; it is a separate sentence. If the sentence is treated as a factor, it is the

---

*overriding factor* and makes all the other considerations (including *overall* cost to taxpayers) secondary." Legislative Reference Bureau Drafting File for 1995 Wis. Act 92, *Letter from Wisconsin Coalition For Advocacy to Senator Carol Buettner dated September 5, 1995.* Senator Gwendolynne S. Moore introduced numerous amendments suggested by advocacy groups concerned with the strong limitations on funding. The legislature was fully aware that the cost to counties was the dominant consideration and passed the bill in its original form. *See* Legislative Reference Bureau Drafting File for 1995 Wis. Act 92, *Bill History for A.B. 244.*

dominant factor. If it is not treated as a factor, it must be treated as a condition that overrides the factors.

¶ 60.  Even the sentence in subsection (9) that calls for placement "in the least restrictive environment consistent with the needs of the person to be placed" is *not* unconditional. It reads "consistent with the needs of the person to be placed *and with the placement re-sources of the appropriate board* specified under s. 55.02." Wis. Stat. § 55.06(9) (emphasis added). The primacy of the funding limitation could not be more plain.

¶ 61.  Counties are creatures of the legislature. *State ex rel. Conway v. Elvod,* 70 Wis. 2d 448, 450, 234 N.W.2d 354 (1975). "In governmental matters, the county is simply the arm of the state." *Dane Co. v. H&SS Dep't,* 79 Wis. 2d 323, 330, 255 N.W.2d 539 (1977). It exists "in large measure to help handle the state's burden of political organization and civil admin-istration." *Id.* If the state has plenary power to direct counties what to do, it must also have power to limit their responsibilities. It exercised that power in 1995 Wis. Act 92.

¶ 62.  State and federal governments provide most of the funding for protective services for persons with developmental disabilities. The principal funding sources are community aids and the waiver programs related to Medical Assistance.

¶ 63.  Community aids are the largest source of state aid to counties. *See* Yvonne M. Arsenault, Wisconsin Legislative Fiscal Bureau, *Informational Paper No. 48, Community Aids* 1 (2001) [hereinafter *Community Aids*]. Counties received $304.9 million in community aids in fiscal year 2000. *Id.* By contrast, the state's other large source of aid to counties, the shared revenue program, totaled only $189.7 million in that year. *Id.* Community aids are distributed to the counties

413

through the Wisconsin Department of Health and Family Services (DHFS), to provide services in two broad categories: (1) social services for low-income persons and children in need; and (2) services for persons with mental illness, substance abuse problems, or developmental disabilities. *Id.* County allocations are determined by a three-factor statutory formula that takes into consideration a county's needs, an urban-rural factor, and the county's ability to pay. *Id.* at 2. In 2000 the statutes required counties to provide matching funds in the amount of 9.89 percent for the basic county allocation of community aids. Wis. Stat. § 46.495(1)(d); *Community Aids, supra,* at 6.

¶ 64. Most Wisconsin counties appropriate more money for protective services than they are required to appropriate under state law. *Community Aids, supra,* at 6. Dunn County is no exception. Dunn County's "over-match" for calendar years 1994–1999 is shown as follows:

1994:  1,056,547[4]

1995:  1,010,081[5]

1996:  1,255,055[6]

1997:  1,054,709[7]

---

[4] *See* Rachel Cissne, Wisconsin Legislative Fiscal Bureau, *Informational Paper No. 50, Financial Assistance to Counties for Human Services* 23 (1997).

[5] *Id.*

[6] *See* Rachel Carabell, Wisconsin Legislative Fiscal Bureau, *Informational Paper No. 49, Financial Assistance to Counties for Human Services* 18 (1999).

[7] *Id.*

1998:   1,169,693[8]

1999:   2,192,249[9]

¶ 65. In 1999 Dunn County's overmatch of $2,192,249 exceeded the $1,859,550 allocation from the state. *Id.* at 17, 22. Dunn County spent approximately $13.5 million on health and human services in 1999. Wisconsin Department of Revenue, *County and Municipal Revenues and Expenditures 1999* 3 (2001), *available at http://www.dor.state.wi.us/html/stats.html.* This subject area was the largest single item in the county budget. *Id.* The county's 1999 overmatch of $2,192,249 represented more than 6 percent of its total budget. *Id.* No amount of overmatch spending will secure a greater allocation of community aids for a county than the legislature has budgeted. Wis. Stat. § 46.40(2).

¶ 66.   Medical Assistance waiver programs are another major source of assistance to counties for protective services. *See* Yvonne M. Arsenault and Richard Megna, Wisconsin Legislative Fiscal Bureau, *Informational Paper No. 50, Services for Persons with Developmental Disabilities* 9 (2001) [hereinafter *Services for Persons with Developmental Disabilities*]. Medical Assistance is a program that provides health services to low-income persons. *See* Rachel Carabell and Richard Megna, Wisconsin Legislative Fiscal Bureau, *Informational Paper No. 43, Medical Assistance and BadgerCare* 1 (2001) [hereinafter *Medical Assistance and BadgerCare*]. "Medicaid," as it is otherwise known, is administered by DHFS within strict federal guidelines regarding eligibility, types of services, payment levels and administration. *Id.*

---

[8] *See* Yvonne M. Arsenault, Wisconsin Legislative Fiscal Bureau, *Informational Paper No. 48, Community Aids* 17 (2001).

[9] *Id.*

¶ 67. The state has secured a series of federal waivers to develop innovative methods of delivering or paying for medical assistance services. *Id.* at 44. For instance, CIP IA and CIP IB are two "community integration programs" that help people with developmental disabilities. *Id.* at 45. The CIP IA program funds services for people who are relocated from state centers for the developmentally disabled. *See Services for Persons with Developmental Disabilities, supra,* at 9. The CIP IB program funds services for people relocated or diverted from nursing homes and intermediate care facilities to community-based programs. *Id.* The state pays a 41 percent match to obtain federal Medicaid dollars for these programs and then reimburses the counties for their costs of community integration services. *Id.* at 10. Counties have the option to step forward and put up additional match money from community aids or local taxes to secure federal funds. *See Medical Assistance and BadgerCare, supra,* at 45. This occurs in more than two-thirds of the CIP IB cases. *Id.*

¶ 68. Clearly, a county may appropriate additional money for protective services and may acquire additional federal funds as a result. But Chapter 55 does not *require* a county to do so. "The county may not be required to provide funding, in addition to its funds that are required to be appropriated to match state funds, in order to protectively place an individual." Wis. Stat. § 55.06(9)(a).

¶ 69. As a practical matter, a county may not be able to locate additional funds when a circuit court issues an order for a less restrictive placement, unless it diverts money from other programs. Not all community aids dollars are spent on developmentally disabled persons. In the future, the biggest source of additional funding for the developmentally disabled may be money

diverted from other persons in need. These spending priorities ought to be decided by policymakers in other branches of government, not by the courts.

¶ 70.    Thousands of Wisconsin citizens need protective services. This case is not about the legitimacy of these needs. This case is about the power of state courts to force additional county spending for human services when a county has fulfilled all its obligations under state law.

¶ 71.    In my view, supporters of the developmentally disabled must look to the legislature, not the courts, for the relief they seek. Because the majority appears to decide otherwise, I respectfully dissent.

¶ 72.    I am authorized to state that Justices JON P. WILCOX and DIANE S. SYKES join this dissent.