Gregory G. PHELPS, Marlene L. Phelps,
Estate of Adam Phelps, Deceased,
by his Special Administrator,
Gregory G. Phelps, and Caroline Phelps
and Kyle Phelps, minors,
by their Guardian ad Litem,
William M. Cannon,
Plaintiffs-Respondents-Petitioners,

v.

PHYSICIANS INSURANCE COMPANY OF WISCONSIN, INC.,
a Wisconsin insurance corporation,
and Matthew Lindemann, M.D.,
Defendants-Appellants-Cross Petitioners.

Supreme Court

*No. 2003AP580. Oral argument March 3, 2005.
—Decided June 22, 2005.*

2005 WI 85

(Also reported in 698 N.W.2d 643.)

70

74

For the plaintiffs-respondents-petitioners there were briefs by *William M. Cannon, Sarah F. Kaas* and *Cannon & Dunphy, S.C.,* Brookfield, and oral argument by *William M. Cannon.*

For the defendants-appellants-cross petitioners there were briefs by *John S. Skilton, Christopher G. Hanewicz, Gabrielle E. Bina* and *Heller Ehrman White & McAuliffe LLP,* Madison; and *Michael B. Van Sicklen, Michael S. Heffernan* and *Foley & Lardner LLP,* Madison, and oral argument by *Michael B. Van Sicklen* and *John S. Skilton.*

An amicus curiae brief was filed by *Emile H. Banks, Jr., Vicki L. Arrowood* and *Emile Banks & Associates, LLC,* Milwaukee, on behalf of OHIC Insurance Company.

An amicus curiae brief was filed by *Timothy J. Muldowney* and *LaFollette, Godfrey & Kahn,* Madison, on behalf of the Wisconsin Medical Society, American Medical Association and Wisconsin Hospital Association, Inc.; *Laura J. Leitch,* Madison, on behalf of Wisconsin Hospital Association, Inc.; *Mark L. Adams* and *Melanie E. Cohen,* Madison, on behalf of the Wisconsin Medical Society; and *Leonard Nelson* and *AMA Litigation Center,* Chicago, IL, on behalf of the American Medical Association.

An amicus curiae brief was filed by *Gerald J. Bloch, Frank Crivello* and *Warshafsky, Rotter, Tarnoff, Reinhardt & Bloch, S.C.,* Milwaukee, on behalf of the Wisconsin Academy of Trial Lawyers.

¶ 1. ANN WALSH BRADLEY, J. This medical malpractice case arises out of the death of Adam Phelps at St. Joseph's Hospital in Milwaukee on November 24, 1998. At that time, Marlene Phelps, and her unborn twins, Adam and Kyle, were under the care of Dr. Matthew Lindemann, who was then an unlicensed first-year medical resident. The complaint alleged, and the circuit court found in a trial to the court, that Dr. Lindemann negligently caused Adam's death. The circuit court then apportioned 80% of the causal negligence to Dr. Lindemann and 20% to St. Joseph's hospital. The court of appeals subsequently reversed.[1]

¶ 2. The petitioners, Gregory and Marlene Phelps, et al., seek review of the decision of the court of appeals. They contend that the court of appeals erred in holding that (1) excusable neglect warranted granting the defendants' motion to extend the time within which to pay their jury fee thus preserving their right to a jury trial; and (2) Dr. Lindemann was subject to the standard of care applicable to "his class." Additionally, the petitioners argue that the health care services review privilege found in Wis. Stat. § 146.38 (1997–98) does not apply to this case.[2]

¶ 3. Cross-petitioners, Dr. Lindemann and Physicians Insurance Company of Wisconsin, Inc., also seek

---

[1] *Phelps v. Physicians Ins. Co.,* 2004 WI App 91, 273 Wis. 2d 667, 681 N.W.2d 571 (reversing the order for judgment of the circuit court for Milwaukee County, Michael P. Sullivan, Judge).

[2] All references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

review of the decision of the court of appeals. The cross-petitioners assert that the court of appeals erred in narrowly construing the term "health care provider" as it appears in Wis. Stat. § 893.55(4), so as to exclude Dr. Lindemann from its protection. According to the cross-petitioners, such a result is contrary to the legislative intent and inconsistent, with this court's prior case law.[3]

¶ 4. We conclude that (1) the cross-petitioners waived their right to a jury trial by not timely paying the jury fee, and the circuit court properly denied their motion to extend time for paying the fee; (2) Dr. Lindemann should be held to the standard of care applicable to an unlicensed first-year resident; (3) the health care services review privilege found in Wis. Stat. § 146.38 does not apply to this case; and (4) the cap on noneconomic damages imposed by Wis. Stat. § 893.55(4)(b) does not apply to Dr. Lindemann under the facts presented. However, we remand the matter to the circuit court for a determination of whether Dr. Lindemann was a "borrowed employee" of St. Joseph's Hospital and therefore entitled to the cap protection as an "employee" of a health care provider under Wis. Stat. § 893.55(4)(b). Accordingly, we reverse the decision of the court of appeals and remand to the circuit court for further proceedings.[4]

---

[3] The cross-petitioners also maintain that the surviving children should not have been awarded "loss of society and companionship" damages stemming from their mother's "emotional distress injuries." The court of appeals declined to address this issue on grounds that it was inadequately briefed. *Phelps,* 273 Wis. 2d 667, ¶ 49. We therefore deem it waived and do not address it here.

[4] The issue of whether Dr. Lindemann was a "borrowed employee" of St. Joseph's hospital arose twice at the circuit

¶ 5. The relevant facts are not in dispute. Marlene Phelps (hereinafter "Marlene") discovered that she was pregnant with twins in June 1998. Soon thereafter, she started bleeding and was successfully treated at St. Joseph's Hospital in Milwaukee. After that episode, she was placed on strict home bed rest.

¶ 6. Marlene's pregnancy progressed without incident until October 18, 1998, when another bleeding episode occurred. She was admitted to St. Joseph's Hospital and continued her program of bed rest. Two days later, an ultrasound revealed that one of the twins was a breech presentation (legs first). Based on this finding, Marlene was deemed a high-risk patient who required a c-section for delivery of the twins.

¶ 7. In the early morning of November 24, 1998, Marlene was awakened with constant suprapubic pain. The on-call resident, Dr. Matthew Lindemann, was contacted. Dr. Lindemann was an unlicensed first-year resident and, according to the circuit court's findings of facts, was an employee of the Medical College of Wiscon-

court level. The defendants argued, both in their brief in opposition to the plaintiffs' motion for declaratory judgment and their brief in support of a motion to reconsider, that Dr. Lindemann was a "borrowed employee" and therefore entitled to the cap protection under Wis. Stat. § 893.55(4)(b). The circuit court, however, never explicitly addressed the merits of the issue.

In its decision, the court of appeals remanded the matter, explaining, "The trial court made no findings on that issue. As noted, we cannot find facts." *Phelps,* 273 Wis. 2d 667, ¶ 46 n. 10. Like the court of appeals, because we cannot find facts, we remand to the circuit court the issue of whether Dr. Lindemann was a "borrowed employee" of St. Joseph's Hospital. In doing so, we are mindful that this may ultimately be dispositive of our discussion of the cap on noneconomic damages. Nevertheless, for completeness, we address the applicability of the cap in Section VI.

sin Affiliated Hospital.[4a] His primary duty was to assess and report findings and differential diagnoses to an upper level senior resident or to the attending obstetrician. He had no authority, however, to provide primary obstetrical care or perform a c-section on Marlene.

¶ 8. Dr. Lindemann ordered lactated ringers to be administered at 2:40 a.m. for suspected contractions. They did not alleviate Marlene's pain. At 3:00 a.m., Dr. Lindemann reached a differential diagnosis of pubic symphysis pain, bladder pain, labor or placental abruption. Accordingly, he ordered a foley catheter to determine if Marlene had a bladder infection. The urinalysis returned at 3:50 a.m. indicated that she did not.

¶ 9. Due to the continued pain she was experiencing, Marlene requested at 4:15 a.m. that the attending nurse call Dr. Lindemann again. Fetal heart monitoring and an ultrasound established that the twins' heart rates were within normal ranges. Dr. Lindemann informed Marlene that he would take a picture of the ultrasound so that he could consult an upper level senior resident.

¶ 10. After this examination, Dr. Lindemann ordered a potent narcotic, Demerol, to be administered to Marlene at 4:50 a.m. and 5:20 a.m. Dr. Lindemann never satisfactorily explained his whereabouts between 4:15 a.m. and 6:00 a.m. However, there is no evidence that he ever contacted an upper level senior resident to discuss Marlene's case.

¶ 11. Marlene remained in pain when Dr. Lindemann examined her again at 6:00 a.m. At 6:45 a.m., her husband Gregory Phelps (hereinafter "Gregory") arrived at the hospital. Marlene informed Gregory that

---

[4a] The question whether Dr. Lindemann was a "borrowed employee" of St. Joseph's Hospital is to be determined on remand. See ¶ 4, n.4, and ¶ 65.

she felt the need to defecate and asked for assistance to get to the commode. At 7:00 a.m., while sitting on the commode, she reached down and felt toes extending from her.

¶ 12. Her husband rushed to the nurses' desk where he found another doctor, who delivered Adam Phelps (hereinafter "Adam") at 7:20 a.m. Adam was immediately rushed to the neonatal intensive care unit where resuscitation efforts began. The efforts proved unsuccessful, and he was pronounced dead at 7:36 a.m. Adam's death was caused from a combination of asphyxia due to cord entrapment and placental abruption, which impaired his oxygen supply.

¶ 13. During this time, Marlene was rushed from her room to the operating room where anesthesia was administered at 7:30 a.m. The second twin, Kyle, was delivered at 7:43 a.m. Afterward, the treating physicians questioned Dr. Lindemann about his decisions, his whereabouts, and his diagnosis. Dr. Lindemann's responses were primarily that he did not know or remember.

¶ 14. Marlene, Gregory, and their two children Caroline and Kyle (collectively, "the Phelpses") subsequently brought suit on the ground of negligence. On April 14, 2000, they filed an amended summons and complaint, naming Dr. Lindemann and his insurer, Physicians Insurance Company of Wisconsin, Inc. (collectively, "PIC"). PIC filed an answer on May 30, 2000, and demanded a trial by jury.

¶ 15. On July 10, 2001, the trial court entered a standard scheduling order, which provided as material to the jury-trial issue: "Jury fees must be paid in accordance with **Local Rule #371 on or before**

9-1-01 or the jury shall be deemed waived."[5] PIC missed this deadline, paying the $72 jury fee by letter dated September 12, 2001, which was then filed by the clerk of circuit court on September 13, 2001. PIC did not send a copy of the late payment letter to the Phelpses' counsel.

¶ 16. Assuming that the jury fee had been paid on time, on September 11, 2002, counsel for the Phelpses and PIC filed with the trial court a "stipulation to amend scheduling order," which, among other things, set a "12 person Jury Trial" for December 4, 2002. They later filed their respective proposed jury verdicts and proposed jury instructions with the court.

¶ 17. Two days before the scheduled jury trial, the Phelpses' lawyer contacted the court, having discovered that the jury fee was paid late in violation of the scheduling order and local rule. He argued that such action, coupled with PIC's failure to notify him of the late payment, resulted in a waiver of the right to a jury trial. In a telephone conference the next day, the trial court judge agreed, concluding that PIC had waived its right to a jury trial. The court explained:

> This is a highly-complicated matter. I haven't been able to concentrate on anything else because of this issue now this afternoon, but that is neither here nor there. That is an aside, but the point of the matter is it's very clear in the scheduling order that if you don't pay the jury fee timely[,] which I did not know until now, the jury is waived. Gentlemen, the jury is waived. I'll see you tomorrow morning. We are trying this case to the court.

---

[5] Uppercasing omitted; bolding in original; underlined date handwritten.

¶ 18. On December 4, 2002, the day of trial, counsel for PIC moved the circuit court to enlarge, nunc pro tunc, the time for them to pay the jury fee. In support of this request, counsel offered the testimony of Attorney Donald Peterson, whose firm was previously responsible for PIC's representation. Attorney Peterson explained that he became ill with kidney cancer in late August 2001, continued to do some work, but "stopped going into the office." He indicated that the file was shuffled between him and another attorney and that, as a result, the jury fee was not timely paid.

¶ 19. Despite this proffered argument of excusable neglect, the circuit court denied defense counsel's motion to enlarge the time and ordered the case to be tried to the court. The circuit court noted the complexity of the case and observed that there were several pending motions in limine. It appeared concerned that the case may not be able to be tried in the allotted time, requiring further delay. The court stated:

> Well, you know, I suppose the argument goes that I could extend the time for the jury and I guess that is the argument that is made, but there is [sic] a huge number of issues in this case, okay, and a lot of issues about what evidence ought to be before the trier of fact and what won't go before the trier of fact, many of which, the majority of which, as a matter of fact, have been raised by the defense and Dr. Lindemann which have complicated this case tremendously, and in my opinion, it's not a suitable place for me to exercise my discretion for those reasons. That is largely it. It's a situation of the defense's making my position. This is a time of year it's going to be very difficult to get this case in as it is before the Christmas break and, you know, given the complications that have come up in the case because of claims of — requests by the defense for motions in limine, requests by the plaintiffs for motions in limine,

additional discovery and all of this, these are things the court can handle in a court trial a lot more simply and keep the case moving so we get these parties their day in court, and I — sorry, but we are going to try this case to the court, folks.

¶ 20. During the course of the eight-day trial, the circuit court ordered the production of a letter from Dr. Dennis Worthington, the chairman of the Section of Maternal Fetal Medicine at St. Joseph's Hospital, to Dr. Dwight Cruikshank, the chairman of the Department of Obstetrics and Gynecology at the Medical College of Wisconsin. In the letter, Dr. Worthington complained that Dr. Lindemann had "failed in a number of areas" in connection with his treatment of Marlene.

¶ 21. At the completion of trial, the circuit court found that Dr. Lindemann negligently caused Adam's death. In its decision, the circuit court determined Dr. Lindemann to be causally negligent in his care and treatment under both the standard of care applicable to a first-year resident and the standard of care of a physician treating an obstetrical patient. It then apportioned 80% of the causal negligence to Dr. Lindemann and 20% to St. Joseph's Hospital. Gregory and Marlene were awarded $901,015, while their children Caroline and Kyle Phelps were each awarded $45,000.[6] PIC appealed.

¶ 22. The court of appeals reversed and remanded for a jury trial, concluding that the circuit court had failed to apply the proper analysis with regard to the

---

[6] We do not address whether these damages are affected by our recent decisions in *Pierce v. Physicians Insurance Co. of Wisconsin, Inc.*, 2005 WI 14, 278 Wis. 2d 82, 692 N.W.2d 558, and *Maurin v. Hall*, 2004 WI 129, 276 Wis. 2d 18, 688 N.W.2d 655. Such issues were not briefed or argued by the parties.

late payment of the jury fee, and that the defense counsel's late payment was caused by excusable neglect. *Phelps v. Physicians Ins. Co.*, 2004 WI App 91, ¶¶ 12–13, 273 Wis. 2d 667, 681 N.W.2d 571. The court of appeals also held that as a first-year resident, Dr. Lindemann was not a licensed physician and should have been held to the standard of care "applicable to his class." *Id.*, ¶ 25.

¶ 23. In addressing Dr. Worthington's letter concerning Dr. Lindemann's care of Marlene, the court of appeals determined that Dr. Lindemann was a "health care provider" for purposes of Wis. Stat. § 146.38 and set forth factual inquiries to be made on remand for determining the applicability of the privilege. *Id.*, ¶¶ 36, 40. Finally, the court of appeals ruled that the cap on noneconomic damages imposed by Wis. Stat. § 893.55(4)(b) did not apply to Dr. Lindemann. *Id.*, ¶ 47. Both the Phelpses and PIC petitioned this court for review.

## II

¶ 24. This case presents us with several issues. Initially, we must determine whether PIC waived its right to a jury trial by failing to timely pay the jury fee, and if so, whether the circuit court properly exercised its discretion when it denied PIC's request to enlarge the time on the basis of excusable neglect. The decision to forgive late payment of a jury fee is within the circuit court's discretion. *Chitwood v. A.O. Smith Harvestore Prods., Inc.*, 170 Wis. 2d 622, 628, 489 N.W.2d 697 (Ct. App. 1992). Accordingly, we review the decision of the circuit court to determine if it erroneously exercised its discretion.

¶ 25. Additionally, we must address the proper standard of care for Dr. Lindemann, a then unlicensed first-year medical resident. This presents a question of law subject to independent appellate review. *See Taft v. Derricks,* 2000 WI App 103, ¶ 10, 235 Wis. 2d 22, 613 N.W.2d 190. Finally, we must resolve the applicability of two statutes to this case: the health care services review privilege found in Wis. Stat. § 146.38, and the cap on noneconomic damages imposed by Wis. Stat. § 893.55(4)(b). The interpretation and application of these statutes also present questions of law subject to independent appellate review. *Dunn County v. Judy K.,* 2002 WI 87, ¶ 13, 254 Wis. 2d 383, 647 N.W.2d 799 (citing *Waukesha County v. Steven H.,* 2000 WI 28, ¶ 16, 233 Wis. 2d 344, 607 N.W.2d 607).

III

¶ 26. We turn first to the issue of whether PIC waived its right to a jury trial by failing to timely pay the jury fee, and, if so, whether the circuit court properly exercised its discretion when it denied PIC's motion to enlarge the time on the basis of excusable neglect. PIC submits that the answer to both of these questions is "no." It maintains that late payment of a jury fee is not a basis for finding waiver of the right to trial by jury. Additionally, it asserts that the circuit court erroneously exercised its discretion by denying its motion to extend the time for paying the jury fee. As such, PIC asks that we uphold the decision of the court of appeals to reverse and remand for a new jury trial.

¶ 27. The Phelpses counter that PIC waived its right to a jury trial by failing to timely pay the jury fee as required by the scheduling order and local rule. They

also contend that the court of appeals erred in finding excusable neglect that warranted granting PIC's request the morning of trial to enlarge the time to pay the jury fee. According to the Phelpses, the evidence in the record supports affirming the decision of the circuit court to waive the jury trial and proceed with a bench trial instead.

¶ 28. Article I, Section 5 of the Wisconsin Constitution provides that "the right of trial by jury shall remain inviolate."[7] However, that same section makes clear that "a jury may be waived by the parties in all cases in the manner prescribed by law." Wis. Const. art. I, § 5. Wisconsin Stat. §§ 805.01(3) and 814.61 are but two examples of how waiver may be effectuated. Wisconsin Stat. § 805.01(3) provides:

> Waiver. The failure of a party to demand in accordance with sub. (2) a trial in the mode to which entitled constitutes a waiver of trial in such mode. The right to trial by jury is also waived if the parties or their attorneys of record, by written stipulation filed with the court or by an oral stipulation made in open court and entered in the record, consent to trial by the court sitting without a jury. A demand for trial by jury made as herein provided may not be withdrawn without the consent of the parties.

¶ 29. Meanwhile, Wis. Stat. § 814.61(4), the provision more relevant to this case, states:

> Jury fee. For a jury in all civil actions . . . a nonrefundable fee of $6 per juror demanded to hear the case to be paid by the party demanding a jury within the time permitted to demand a jury trial. *If the jury fee is not*

---

[7] The right of trial by jury is also codified by Wis. Stat. § 805.01. It reads: "The right of trial by jury as declared in article I, section 5 of the constitution or as given by a statute and the right of trial by the court shall be preserved to the parties inviolate."

■■■■■■■■■

*paid, no jury may be called in the action, and the action may be tried to the court without a jury.*

(Emphasis added.)

■

¶ 30. From the language of Wis. Stat. § 814.61(4), it is evident that the failure to pay a jury fee is a basis for finding waiver of the right to trial by jury. Because the venue of this case is Milwaukee County, the time permitted to pay the jury fee is dictated by the court's scheduling order and local court rules. Here, paragraph 9 of the court's scheduling order provides that "[j]ury fees must be paid in accordance with **Local Rule #371 on or before** 9–1-01 or the jury shall be deemed waived." Milwaukee County Circuit Court Local Rule 371 states that if a party requesting a jury fails to timely pay the fee: "[I]t shall constitute a waiver of the right of jury trial and consent by all parties to a trial to the court sitting without a jury."

¶ 31. This court has previously recognized that a reasonable jury fee does not violate the right of trial by jury as guaranteed by the Wisconsin Constitution. *State v. Graf,* 72 Wis. 2d 179, 185, 240 N.W.2d 387 (1976). In *Graf,* we confronted the issue in the context of a civil traffic forfeiture action. We noted that, "[j]ury fees have been rather uniformly found to be compatible with a right to a jury trial." *Id.* (citing Annot. 32 A.L.R. 865). Furthermore, we quoted the following language as providing a rationale for such fees:

"The Constitution does not guarantee to the citizen the right to litigate without expense, but simply protects him from imposition of such terms as unreasonably and injuriously interfere with his right to a remedy in the law, or impede the due administration of justice."

*Id.* (quoting *Adams v. Corriston,* 7 Minn. 456 (1862)).

Accordingly, we held that "prepayment of jury fees and other costs as a condition for a jury trial . . . was not a violation of the Wisconsin Constitution's preservation of the right to a jury trial." *Id.* at 188.

¶ 32. Any further concern PIC may have regarding the timing requirement of the jury fee is foreclosed by the case of *State ex rel. Prentice v. County Court,* 70 Wis. 2d 230, 234 N.W.2d 283 (1975). There, a motorist filed her demand for a jury trial with payment of jury fee one day outside the applicable timetable. As a result, the court set the matter for bench trial. The motorist argued, among other things, that denial of a jury trial deprived her of a basic constitutional right. This court disagreed, reasoning that "while a defendant has a right to trial by jury in a civil case, he has no vested right under art. I, sec. 5, to the manner or time in which that right may be exercised or waived, since these are merely procedural matters to be determined by law." *Id.* at 240. This holding is dispositive in the present case, resulting in waiver of PIC's right to a jury trial.

¶ 33. Thus, the relevant question becomes whether the circuit court properly exercised its discretion when it denied PIC's motion to enlarge the time on the basis of excusable neglect. We have described excusable neglect as " 'that neglect which might have been the act of a reasonably prudent person under the same circumstances.' It is 'not synonymous with neglect, carelessness or inattentiveness.' " *Hedtcke v. Sentry Ins. Co.,* 109 Wis. 2d 461, 468, 326 N.W.2d 727 (1982) (quoting *Giese v. Giese,* 43 Wis. 2d 456, 461, 168 N.W.2d 832 (1969)). When analyzing this standard, we may undertake our own review of the record to determine whether it "provide[s] support for the circuit court's decision." *Id.* at 471.

¶ 34. In the present case, the circuit court admittedly did not apply the excusable neglect standard when confronted with PIC's request the day of trial for an enlargement of time. Instead, it recognized that there were "a lot of issues about what evidence ought to be before the trier of fact and what won't go before the trier of fact." The court observed that "the majority of [the issues]" were "raised by the defense and Dr. Lindemann which have complicated this case tremendously . . . ."[8] The court appeared concerned about getting the "parties their day in court" and not having to reschedule the case.[9] It noted that because of the many complications raised, including motions in limine by both sides together with a request for additional discovery, that it would be difficult, even as a trial to the court, to get this case completed in the allotted time.

¶ 35. Although the circuit court did not apply the proper legal standard, we are satisfied that the record supports its decision to deny PIC's request for a motion to enlarge time. The reason for this largely stems from PIC's actions, or lack thereof, after mailing in its late payment. At that time, PIC had the option to be forth-

---

[8] In its opinion, the court of appeals cautioned that the fact a case might be easier to resolve without a jury trial does not trump the constitutional guarantee to one. *Phelps,* 273 Wis. 2d 667, ¶ 14 (citing *Fabrikant v. Bache & Co.,* 609 F.2d 411, 419–432 (9th Cir. 1979) (there is no complexity-exception to the Seventh Amendment to the United States Constitution), *cert. denied sub nom.*) Although we are mindful of this concern, we conclude that there is sufficient evidence to sustain the circuit court's ruling.

[9] The record indicates that the case was initially scheduled for trial on September 16, 2002. Subsequently, it was rescheduled for trial on December 4, 2002.

right, notify the circuit court and opposing counsel about the problem, and move for an enlargement of time to pay the jury fee. It chose none of these options. Indeed, 15 months passed by before the issue was raised. Even then, it was not raised by PIC but rather by opposing counsel. We view these facts as fatal to PIC's claim.

¶ 36. On this matter, *Hedtcke* is instructive. There, this court made clear that, "an enlargement of time will be allowed after the time has run only when the initial failure to do the act was the result of excusable neglect *and there has been no inexcusable delay in moving for enlargement." Hedtcke,* 109 Wis. 2d at 469–70 n.3 (emphasis added). Although Attorney Peterson's illness may have accounted for the initial failure to pay the fee,[10] it cannot justify the subsequent delay in moving for an enlargement of time. *See also Millis v. Raye,* 16 Wis. 2d 79, 83, 113 N.W.2d 820 (1962) (counsel's failure to move for an enlargement of time until 14 weeks after a deadline passed is not excusable neglect). As a result, we uphold the circuit court's decision to deny PIC's motion for enlargement of time.

IV

¶ 37. The next issue we must address is the proper standard of care for Dr. Lindemann, a then

---

[10] The Phelpses dispute this, noting that a review of Attorney Peterson's work-related activities in the summer and fall of 2001 reveals that he attended the deposition of Marlene's treating obstetrician the day after the jury fee was due. In support of this argument, the Phelpses filed a motion to supplement the record with a series of correspondence purporting to answer whether Attorney Peterson was indeed in the office on the dates that he claimed. Because we do not resolve the first issue on this basis, we now deny that motion.

unlicensed first-year resident. PIC maintains that Dr. Lindemann should have been held to the standard of care applicable to an unlicensed first-year resident. The Phelpses, on the other hand, assert that the standard of care should be that of an average, fully licensed physician who provides obstetrical care.

¶ 38. A leading case in Wisconsin regarding the standard of care for physicians is *Johnson v. Agoncillo*, 183 Wis. 2d 143, 515 N.W.2d 508 (Ct. App. 1994). There, Dr. Agoncillo, a family practitioner with a general medical practice, undertook to treat a high-risk obstetrical patient. The child was born early and suffered complications stemming from his prematurity. The Johnsons alleged that Dr. Agoncillo was negligent because he did not fulfill the standard of care applicable to physicians who specialize in treating high-risk obstetrical patients. Accordingly, they argued that the circuit court erred by not instructing the jury that Dr. Agoncillo should be held to the standard of care applicable to those specialists.

¶ 39. The court of appeals rejected the Johnsons' claim. In doing so, it explained that the fact "that Dr. Agoncillo chose to care for and treat Ms. Johnson during her high-risk pregnancy did not transform his 'class' of physician to that of those who treat high-risk obstetrical patients." *Id.* at 152. As a result, the court of appeals concluded that Dr. Agoncillo "was and he remained a general family practitioner who treated obstetrical patients and, as instructed by the trial court, he was thus 'required to use the degree of care, skill, and judgment which is usually exercised in the same or similar circumstances' by the average physician in that class." *Id.*

¶ 40. The pattern jury instructions on medical negligence reflect the two competing standards of care

at issue in *Johnson:* one for general physicians and one for specialists. Wis JI—Civil 1023 provides in relevant part:

> In (treating) (diagnosing) (*plaintiff*)'s (injuries) (condition), (*doctor*) was required to use the degree of care, skill, and judgment which reasonable (doctors who are in the general practice) [or] (specialists who practice the specialty which (*doctor*) practices) would exercise in the same or similar circumstances, having due regard for the state of medical science at the time (*plaintiff*) was (treated) (diagnosed). A doctor who fails to conform to this standard is negligent. The burden is on (*plaintiff*) to prove that (*doctor*) was negligent.

¶ 41. The problem, of course, with *Johnson* and Wis JI—Civil 1023 is that both ignore the unique status of an unlicensed first-year resident.[11] As an unlicensed first-year resident, Dr. Lindemann's authority was limited. Although he could refer to himself as an "M.D.," his freedom of action was more restricted than that of a licensed physician. Indeed, the circuit court found that Dr. Lindemann "had no authority or privileges to provide primary obstetrical care," and "was not supposed to act as the primary attending physician." Rather, "[h]is primary duty was to assess and report findings and differential diagnoses to an upper level senior resident or to the attending obstetrician."

¶ 42. This court has not previously addressed the peculiar status of unlicensed first-year residents in the context of medical malpractice. Only a few states have addressed the question of whether first-year residents should be held to the same standard of care as licensed

---

[11] Although they are graduates of medical school, first-year residents are unlicensed to practice medicine. The reason for this is that Wis. Stat. § 448.05(2) requires an additional "postgraduate training of 12 months" before issuance of a license.

physicians, and the results appear somewhat mixed. *Compare, e.g., Rush v. Akron Gen. Hosp.*, 171 N.E.2d 378, 381 (Ohio Ct. App. 1957) ("[w]hat is required in the case of an [unlicensed] intern is that he shall possess such skill and use such care and diligence in the handling of emergency cases as capable medical college graduates serving hospitals as interns ordinarily possess under similar circumstances . . . .") *with Centman v. Cobb,* 581 N.E.2d 1286, 1288 (Ind. Ct. App. 1991) ("[w]e conclude that such [a first-year resident] is a practitioner of medicine required to exercise the same standard of skill as a physician with an unlimited license to practice medicine.").

¶ 43. Answering this question now, we determine that physicians like Dr. Lindemann should be held to the standard of care applicable to an unlicensed first-year resident based on the unique restrictions described above.[12] Although we anticipate this new standard of care to be lower than that of an average licensed physician in some cases, we do not expect that it will become a grant of immunity. After all, unlicensed first-year residents are graduates of a medical school who provide sophisticated health care services appropriate to their "in training" status. Therefore, unlicensed residents could still be found negligent if, for example, they undertook to treat outside the scope of their authority and expertise, or they failed to consult with someone more skilled and experienced when the standard of care required it.

[12] Thus, our decision should not be read as an open invitation to further nuance the basic classifications of general practitioner and specialist. Although we establish a separate standard for an unlicensed physician, we do not intend separate standards for licensed "in training" physicians.

¶ 44. In the present case, the circuit court found Dr. Lindemann to be causally negligent under both standards of care. That is, it found him to be negligent under the standard applicable to a first-year resident as well as under the standard applicable to an average physician treating an obstetrical patient.[13] The circuit court then apportioned 80% of the causal negligence to Dr. Lindemann and 20% to St. Joseph's Hospital. The court of appeals questioned this conclusion, noting that the percentages of comparative negligence allocated to Dr. Lindemann and St. Joseph's presumably may be influenced by a change in the standards by which their relative conduct was measured. *Phelps,* 273 Wis. 2d 667, ¶ 23.

¶ 45. The apportionment of comparative negligence is a matter left to the trier of fact. *Voight v. Riesterer,* 187 Wis. 2d 459, 467, 523 N.W.2d 133 (Ct. App. 1994). Where more than one reasonable inference can be drawn from the evidence, appellate courts will accept the inference drawn by the trier of fact. *Id.* (citing *Brain v. Mann,* 129 Wis. 2d 447, 452, 385 N.W.2d 227 (Ct. App. 1986)). Appellate courts will sustain the apportionment of comparative negligence unless the circuit court's determination was clearly erroneous. *Id.* (citing Wis. Stat. § 805.17(2)). Examining the record in the present case, we are satisfied that the circuit court's exercise of discretion was not clearly erroneous.

---

[13] Contrary to the assertion of PIC, there was an effort made to prove that Dr. Lindemann met the lower standard of care. Indeed, PIC's own experts, Drs. Broekhuizen and Clark, addressed the matter.

¶ 46. Here, the circuit court's factual findings and conclusions of law specifically delineate the ways in which Dr. Lindemann violated both standards of care.[14] From these findings and conclusions emerge two primary faults that are equally applicable to unlicensed first-year residents and average physicians treating an obstetrical patient: (1) the failure to consult with another physician, whether an upper level resident or an attending obstetrician; and (2) the failure to move Marlene to the Labor and Delivery section of the hospital. The court's decision states in relevant part:

- At 4:15 a.m. "The standard of care applicable to a first year resident and the standard determined by this court in its letter decision [of an average physician treating an obstetrical patient], required the patient to be moved to Labor and Delivery and the attending physician or the staff physician to be contacted to assess the patient."

- At 6:00 a.m., "The standard of care required Dr. Lindemann to notify an upper level senior resident or the attending obstetrician *and* move Marlene Phelps to the Labor and Delivery section for closer monitoring by labor and delivery nurses and the staff or attending obstetrician."

- That the defendant, Dr. Matthew Lindemann was negligent in his care and treatment of Marlene Phelps and Adam Phelps under both the standard of care applicable to a first year

---

[14] To the extent the circuit court erred in applying the standard of care applicable to an average physician treating an obstetrical patient, we deem that error harmless.

> resident and the standard determined to be applicable by this court in its decision dated November 27, 2002.

¶ 47. Thus, as applied to the facts of this case, the competing standards of care were not as disparate as the court of appeals surmised. A review of the record indicates that the circuit court found Dr. Lindemann negligent under either standard, and that his negligent conduct was essentially the same: (1) the failure to consult with another physician; and (2) the failure to move Marlene to the Labor and Delivery section of the hospital. Given these findings, we are not persuaded that the percentages of comparative negligence allocated to Dr. Lindemann for his actions and St. Joseph's Hospital for the implementation of its residency program would be influenced by a change in the standards by which their relative conduct was measured. Accordingly, we conclude that the circuit court's exercise of discretion was not clearly erroneous.

V

¶ 48. We turn next to the applicability of the health care services review privilege found in Wis. Stat. § 146.38. This issue stems from a letter written by Dr. Worthington to Dr. Cruikshank regarding Dr. Lindemann's actions on November 24, 1998. In the letter, Dr. Worthington complained that Dr. Lindemann had "failed in a number of areas," which he specified, in connection with his treatment of Marlene. PIC claims that the letter was protected from disclosure by Wis. Stat. § 146.38. The Phelpses, by contrast, argue that the privilege does not apply.

¶ 49. Wisconsin Stat. § 146.38(1m) provides, with exceptions not material here, that "[n]o person who participates in the review or evaluation of the services

of health care providers . . . may disclose any information acquired in connection with such review or evaluation." Wis. Stat. § 146.38(2) addresses several distinct categories of materials created by the statute and the applicability of the privilege to each one:

All organizations or evaluators reviewing or evaluating the services of health care providers shall keep a record of their investigations, inquiries, proceedings and conclusions. No such record may be released to any person under s. 804.10(4) or otherwise except as provided in sub. (3). No such record may be used in any civil action for personal injuries against the health care provider or facility; however, information, documents or records presented during the review or evaluation may not be construed as immune from discovery under s. 804.10(4) or use in any civil action merely because they were so presented. Any person who testifies during or participates in the review or evaluation may testify in any civil action as to matters within his or her knowledge, but may not testify as to information obtained through his or her participation in the review or evaluation, nor as to any conclusion of such review or evaluation.

¶ 50. The purpose of the health care services privilege is to " 'protect the confidentiality of the peer review process, in the hope that confidentiality would encourage free and open discussion, among physicians knowledgeable in an area, of the quality of treatment rendered by other physicians.' " *Braverman v. Columbia Hospital, Inc.*, 2001 WI App 106, ¶ 14, 244 Wis. 2d 98, 629 N.W.2d 66 (quoting *State ex rel. Good Samaritan v. Moroney*, 123 Wis. 2d 89, 98, 365 N.W.2d 887 (Ct. App. 1985)). The peer review contemplated by the statute is designed to aid physicians on the hospital staff in maintaining and improving the quality of their work. *Id.* (citing *Moroney*, 123 Wis. 2d at 98).

¶ 51. In analyzing this issue, the first question posed is whether Dr. Lindemann is a "health care provider," so that Dr. Worthington's letter might qualify as a "review or evaluation" of Dr. Lindemann's "services" in connection with treatment of Marlene. The term "health care provider" is not defined in the statute for the health care services review privilege. However, by virtue of § 146.38(1)(b), it "includes an ambulance service provider, as defined in s. 146.50(1)(c), an emergency medical technician, as defined in s. 146.50(1)(e), and a first responder, as defined in s. 146.50(1)(hm)." Significantly, none of these three categories would qualify as "health care providers" under the more limited definition found in Wis. Stat. ch. 655, which governs medical malpractice claims against health care providers.[15]

¶ 52. Although it appears that the definition of "health care provider" under Wis. Stat. § 146.38(1m) is more expansive than the definition of "health care provider" under Wis. Stat. ch. 655, we need not definitely resolve the question. Instead, we determine that even if Dr. Lindemann is a "health care provider" under Wis. Stat. § 146.38(1m), the peer review privilege here does not apply because the letter was not part of the peer review evaluation process.

¶ 53. The parties dispute whether the information

[15] Wisconsin Stat. §§ 655.001(8) and 655.002(1)(a) together define "health care provider," as relevant here, as "[a] physician." As we have seen, a "physician" is, as relevant here, "a medical . . . physician licensed under ch. 448." Wis. Stat. § 655.001(10m). Because Dr. Lindemann was not yet licensed when he treated Marlene, he was not a "health care provider" under Wis. Stat. ch. 655.

in Dr. Worthington's letter was "acquired in connection with such review or evaluation." In addressing this matter, we note that the party asserting the health care services review privilege bears the burden of establishing two conditions. First, the investigation must be part of a program organized and operated to improve the quality of health care at the hospital. *Mallon v. Campbell,* 178 Wis. 2d 278, 287, 504 N.W.2d 357 (Ct. App. 1993). Second, the person conducting the investigation must be acting on behalf of, or as part of a group with relatively constant membership, officers, a purpose and a set of regulations. *Id.*

¶ 54. We conclude that PIC cannot meet its burden. Here, the testimony of Patricia Kaldor, the vice-president in charge of patient services at St. Joseph's Hospital, established that any investigation conducted of Dr. Lindemann was initiated by the hospital. Moreover, Dr. Worthington confirmed that the hospital's peer review committee was not convened to review Dr. Lindemann's case.[16] Thus, we are satisfied that the investigation of Dr. Lindemann was initiated to report a problem to Dr. Cruikshank, the supervisor of the residency program in which Dr. Lindemann was enrolled, and not to improve the quality of health care at the hospital. Accordingly, we determine that Wis. Stat. § 146.38 does not apply to this case.

VI

¶ 55. Finally, we consider the applicability of the cap on noneconomic damages imposed by Wis. Stat. § 893.55(4)(b). PIC argues that the damage limitations

---

[16] This fact is significant as Wis. Stat. § 146.38 is generally referred to as the "peer review" statute.

provided in Wis. Stat. § 893.55(4) apply to unlicensed first-year medical residents. Meanwhile, the Phelpses contend that the damage limitations do not apply to unlicensed first-year residents who are not covered by Wis. Stat. ch. 655.

¶ 56. Wisconsin Stat. § 893.55 has two parts. Subsections (1)-(3) set forth the statutes of limitations for actions to recover damages for injury arising from treatment by a health care provider:

(1) Except as provided by subs. (2) and (3), an action to recover damages for injury arising from any treatment or operation performed by, or from any omission by, a person who is a *health care provider,* regardless of the theory on which the action is based, shall be commenced within the later of:

(a) Three years from the date of the injury, or

(b) One year from the date the injury was discovered or, in the exercise of reasonable diligence should have been discovered, except that an action may not be commenced under this paragraph more than 5 years from the date of the act or omission.

(2) If a *health care provider* conceals from a patient a prior act or omission of the provider which has resulted in injury to the patient, an action shall be commenced within one year from the date the patient discovers the concealment or, in the exercise of reasonable diligence, should have discovered the concealment or within the time limitation provided by sub. (1), whichever is later.

(3) When a foreign object which has no therapeutic or diagnostic purpose or effect has been left in a patient's body, an action shall be commenced within one year after the patient is aware or, in the exercise of reasonable care, should have been aware of the presence of the object or within the time provided by sub. (1), whichever is later.

(Emphasis added.)

¶ 57. Subsections (4)-(5), by contrast, set forth the procedure for implementing the noneconomic damage cap in Wis. Stat. ch. 655.

(4)(a) In this subsection, "noneconomic damages" means moneys intended to compensate for pain and suffering; humiliation; embarrassment; worry; mental distress; noneconomic effects of disability including loss of enjoyment of the normal activities, benefits and pleasures of life and loss of mental or physical health, well-being or bodily functions; loss of consortium, society and companionship; or loss of love and affection.

(b) The total noneconomic damages recoverable for bodily injury or death, including any action or proceeding based on contribution or indemnification, may not exceed the limit under par. (d) for each occurrence on or after May 25, 1995, from all *health care providers* and all employees of *health care providers* acting within the scope of their employment and providing health care services who are found negligent and from the *patients compensation fund.*

(c) A court in an action tried without a jury shall make a finding as to noneconomic damages without regard to the limit under par. (d) . . .

(d) The limit on total noneconomic damages for each occurrence under par. (b) on or after May 25, 1995, shall be $350,000 and shall be adjusted by the director of state courts . . .

(e) Economic damages recovered *under ch. 655* for bodily injury or death, including any action or proceeding based on contribution or indemnification, shall be determined for the period during which the damages are expected to accrue, taking into account the estimated life expectancy of the person, then reduced to present value, taking into account the effects of inflation.

101

(f) Notwithstanding the limits on noneconomic damages under this subsection, damages recoverable against *health care providers* and an employee of a health care provider, acting within the scope of his or her employment and providing health care services, for wrongful death are subject to the limit under s. 895.04(4). If damages in excess of the limit under s. 895.04(4) are found, the court shall make any reduction required under s. 895.045 and shall award the lesser of the reduced amount or the limit under s. 895.04(4).

(5) *Every award of damages under ch. 655* shall specify the sum of money, if any, awarded for each of the following for each claimant for the period from the date of injury to the date of award and for the period after the date of award, without regard to the limit under sub. (4) (d) . . .

(Emphasis added.)

■

¶ 58. As noted above, the subdivision at issue is Wis. Stat. § 893.55(4)(b). Within that subdivision, the parties dispute the meaning of the term "health care provider." The term "health care provider" is used elsewhere in Wis. Stat. § 893.55, in subsections (1) and (2). Typically, a term used in multiple subsections within a statute is given the same meaning. *General Castings Corp. v. Winstead,* 156 Wis. 2d 752, 759, 457 N.W.2d 557 (Ct. App. 1990). However, as the court of appeals recognized, "[t]his is one of those rare instances where it does not." *Phelps,* 273 Wis. 2d 667, ¶ 42.

¶ 59. In *Clark v. Erdmann,* 161 Wis. 2d 428, 468 N.W.2d 18 (1991), this court considered whether the medical malpractice statute of limitations found in Wis. Stat. § 893.55(1) applied to podiatrists. It concluded that it did, reasoning that the term "plainly applies to anyone who professionally provides health care to oth-

102

ers. Podiatrists do exactly that: they provide health care to others; and, like other professional health care providers, they are licensed to practice by the state medical examining board pursuant to ch. 448, Stats." *Id.* at 438–39. The *Clark* decision is distinguishable from the present case, however, as it addressed Wis. Stat. § 893.55(1) dealing with the statute of limitations. There was no issue before it regarding Wis. Stat. ch. 655 or the noneconomic damage cap in Wis. Stat. § 893.55(4).

¶ 60. Since *Clark,* the court of appeals has extended this broad reading of "health care provider" to other health professions. *See, e.g., Webb v. Ocularra Holding, Inc.,* 2000 WI App 25, ¶¶ 8–15, 232 Wis. 2d 495, 501–09, 606 N.W.2d 552 (optometrists), *overruled on other grounds, Paul v. Skemp,* 2001 WI 42, 242 Wis. 2d 507, 625 N.W.2d 860; *Arenz v. Bronston,* 224 Wis. 2d 507, 512–15, 592 N.W.2d 295 (Ct. App. 1999) (chiropractors); and *Ritt v. Dental Care Associates,* 199 Wis. 2d 48, 60–64, 543 N.W.2d 852, (Ct. App. 1995) (dentists). Again though, these cases considered only the applicability of Wis. Stat. § 895.55's statutes of limitation. None of them held that the medical malpractice noneconomic damage cap in Wis. Stat. § 893.55(4) applied to health care providers who are not subject to Wis. Stat. ch. 655.

¶ 61. Relying on the above cases, PIC maintains that Dr. Lindemann should also be considered a "health care provider" under Wis. Stat. § 893.55, as he professionally provided health care to Marlene as an unlicensed first-year resident. The problem with this argument, of course, is that it ignores the context in which the term "health care provider" is used. This case does not involve subsections (1)-(3) and the applicable statutes of limitations. Rather, it involves subsections (4)-(5) and the cap on noneconomic damages. This is

significant, for subsections (4)-(5) specifically reference Wis. Stat. ch. 655 and/or the patients compensation fund.[17] Likewise, Wis. Stat. § 655.017, which sets forth the cap on noneconomic damages in medical malpractice actions, specifically references Wis. Stat. § 893.55(4).[18]

¶ 62. If we were to accept PIC's argument and hold the cap in Wis. Stat. § 893.55(4) applicable to all health care providers, regardless of whether they fell outside Wis. Stat. ch. 655, troubling questions emerge. For example, what would the purpose of Wis. Stat. § 655.017 be? PIC's reading of Wis. Stat. § 893.55(4) as an independent cap on noneconomic damages would appear to render it superfluous. Moreover, how would courts apply Wis. Stat. § 893.55(4)(b), which references the Fund's payment limit, and Wis. Stat. § 893.55(4)(e) and (5), which expressly reference damages awarded "under ch. 655"? These cannot be applied to a non-chapter 655 case or non-chapter 655 health care provider. As a result, these provisions become conflicting and meaningless as applied to non-chapter 655 health care providers.

---

[17] The "patients compensation fund" refers to the Wisconsin Patients Compensation Fund established by Wis. Stat. § 655.27.

[18] Wisconsin Stat. § 655.017, entitled "Limitation on non-economic damages," provides:

> The amount of noneconomic damages recoverable by a claimant or plaintiff under this chapter for acts or omissions of a health care provider if the act or omission occurs on or after May 25, 1995, and for acts or omissions of an employee of a health care provider, acting within the scope of his or her employment and providing health care services, for acts or omissions occurring on or after May 25, 1995, *is subject to the limits under s. 893.55(4)(d) and (f)*.

(Emphasis added.)

¶ 63. PIC's construction of "health care provider" in Wis. Stat. § 893.55 would also lead to absurd results. *See Strenke v. Hogner,* 2005 WI 25, ¶ 48, 279 Wis. 2d 52, 694 N.W.2d 296 ("Laws must be interpreted, considering the legal and practical consequences, to avoid unreasonable and absurd results."). The history behind the creation of Wis. Stat. ch. 655 in 1975 and the noneconomic damage cap in Wis. Stat. §§ 655.017 and 893.55(4) in 1985 was in response to a perceived *medical* malpractice liability insurance crisis. Yet, PIC would have us give *any* entity that professionally provides health care services (e.g., optometrists, chiropractors, dentists, etc.) the benefit of limited liability as well as Fund coverage, despite the fact that these entities do not pay into the Fund. This we decline to do. Such an expansion is best left to the legislature.

¶ 64. In the end, we view the provisions in Wis. Stat. § 893.55 regulating the award of noneconomic damages and Wis. Stat. ch. 655 as inextricably intertwined. Recognizing this interplay, the court of appeals observed: "[t]he legislature has unambiguously declared that the cap on noneconomic damages in WIS. STAT. § 893.55(4)(b) applies only to those who are health-care providers under WIS. STAT. ch. 655, and to 'employees of health care providers' as the phrase is further limited by § 893.55(4)(b)." *Phelps,* 273 Wis. 2d 667, ¶ 45. We agree with this conclusion. Thus, because Dr. Lindemann was not a "health care provider" as the term is defined by Wis. Stat. ch. 655, we determine that the cap on noneconomic damages imposed by Wis. Stat. § 893.55(4)(b) does not apply.[19]

___

[19] Like the court of appeals, we are mindful that the exclusion from Wis. Stat. ch. 655 of first-year residents is somewhat anomalous because they, like licensed physicians,

## VII

¶ 65. In sum, we conclude that (1) the cross-petitioners waived their right to a jury trial by not timely paying the jury fee, and the circuit court properly denied their motion to extend time for paying the fee; (2) Dr. Lindemann should be held to the standard of care applicable to an unlicensed first-year resident; (3) the health care services review privilege found in Wis. Stat. § 146.38 does not apply to this case; and (4) the cap on noneconomic damages imposed by Wis. Stat. § 893.55(4)(b) does not apply to Dr. Lindemann under the facts presented. However, we remand the matter to the circuit court for a determination of whether Dr. Lindemann was a "borrowed employee" of St. Joseph's Hospital and therefore entitled to the cap protection as an "employee" of a health care provider under Wis. Stat. § 893.55(4)(b). Accordingly, we reverse the decision of the court of appeals and remand to the circuit court for further proceedings.[20]

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded to the circuit court.

¶ 66. JON P. WILCOX, J. did not participate.

¶ 67. DAVID T. PROSSER, J. (*concurring in part, dissenting in part*). Practically speaking, medical residents "provide health care." Yet the majority concludes that medical residents are not "health care providers"

---

provide some health care services to patients. *Phelps,* 273 Wis. 2d 667, ¶ 47. However, that is what the statutes provide, and the legislature is free to remedy this incongruity if it so chooses.

[20] During the pendency of the appeal, the petitioners filed a motion to strike the brief of amicus curiae Ohio Insurance Company. The motion is denied.

by applying a strict interpretation of the definitions in Wis. Stat. ch. 655 to the term "health care provider" in Wis. Stat. § 893.55(4)(b).

¶ 68. However "anomalous" this determination might be,[1] it would be tolerable *if* the majority simultaneously recognized that the legislature has for years extended the coverage of chapter 655 and Wis. Stat. § 893.55(4)(c) and (f) to an "employee of a health care provider," *see* Wis. Stat. §§ 655.005, 655.017, and 893.55(4)(b),[2] and that Dr. Matthew Lindemann was indisputably an "employee" of *some* health care provider whose status would trigger his coverage under the relevant statute. Instead, the majority ducks the issue. The majority remands to the circuit court the question whether Dr. Lindemann was a "borrowed employee" of St. Joseph's Hospital, majority op., ¶ 4, ignoring the fact that the circuit court has implicitly made two previous findings that Dr. Lindemann was *not* such an employee.[3] The majority's remand, without a word of criticism or guidance, is a tacit approval of those two findings, which means that the circuit court is likely to reinstate its two prior determinations.

¶ 69. The conclusion that a medical resident rendering medical care to a hospital's patients within the scope of the resident's duties is not an "employee" of the hospital or any other applicable "health care provider," and thus is not covered by chapter 655 or the Patients

---

[1] *Phelps v. Physicians Ins. Co.*, 2004 WI App 91, ¶ 47, 273 Wis. 2d 667, 681 N.W.2d 571.

[2] All of the provisions of chapter 655, including the damage caps, apply to "employees" of health care providers. *See* Wis. Stat. § 655.005(1).

[3] No one disputes that St. Joseph's Hospital is a health care provider.

Compensation Fund, is more than "anomalous." It defies common sense.

¶ 70. Although I agree with some parts of the majority opinion—such as the applicable standard of care and the health care services review privilege—I write separately largely to discuss points of disagreement.

¶ 71. My concurrence/dissent is divided into three parts. In part I, I reluctantly join the majority's conclusion that the circuit court did not erroneously exercise its discretion in ruling that the defendants waived the right to a jury trial because they did not pay the jury fee on time under the local rule. In this connection, I address two important subtopics: (A) The lack of uniformity among local rules on jury fee payment, and (B) The circuit court's obfuscation of the applicable standard of care, which would not have been permitted if there had been a jury trial. In part II, I dissent from the majority's decision that the damage caps in Wis. Stat. § 893.55(4) do not apply to medical residents. In part III, I comment on the circuit court's award of damages to Gregory Phelps for negligent infliction of emotional distress, in light of this court's recent decision in *Pierce v. Physicians Insurance Co.,* 2005 WI 14, 278 Wis. 2d 82, 692 N.W.2d 558.

I

¶ 72. I reluctantly agree with the majority's conclusion that the circuit judge did not erroneously exercise his discretion in holding that the defendants waived their statutory right to a jury trial. Because the circuit court did not employ the proper standard of "excusable neglect," this court's decision must rest entirely on the facts in the record, and specifically the fact

that the defendant, more than 15 months before trial, paid the jury fee 11 days late. The defendants did not comply with the applicable Milwaukee County Circuit Court rule regarding payment of the jury fee and, as a consequence, they did not get a jury. *See* majority op., ¶¶ 34–35. Our affirmance of the court's ruling sets an extremely high bar to reverse excusable neglect determinations in future cases. Nonetheless, I would affirm and take this opportunity to discuss the disparity among local rules governing the payment of jury fees.

A. Local Rules

¶ 73. Wisconsin Stat. § 805.01 preserves the right to a jury trial in civil cases, so long as the right is not waived. The statute makes no mention of the timing of payment of jury fees. Accordingly, that detail is left to local rules.

¶ 74. A circuit court has the authority to "adopt and amend rules governing practice in that court," so long as the rules are "consistent with rules adopted under s. 751.12[4] and statutes relating to pleading, practice, and procedure." Wis. Stat. § 753.35.[5] Most Wisconsin counties have adopted such rules; eleven have not.[6] The local rule at issue in this case, Milwau-

---

[4] "The state supreme court shall, by rules promulgated by it from time to time, regulate pleading, practice and procedure in judicial proceedings in all courts, for the purposes of simplifying the same and of promoting the speedy determination of litigation upon its merits. . . ." Wis. Stat. § 751.12(1).

[5] *See* 185 Wis. 2d xv (1993) (Wisconsin Supreme Court Order creating Wis. Stat. § 753.35).

[6] The following counties have no local rules: Columbia, Door, Douglas, Florence, Green Lake, Iron, Langlade, Oconto, Pierce, Polk, and Price. *See* Wisconsin circuit court rules by

kee County Circuit Court Local Rule 371, was presumably adopted pursuant to this authority.

¶ 75. A circuit court has wide discretion in enforcing local rules. *Kustelski v. Taylor*, 2003 WI App 194, ¶ 15, 266 Wis. 2d 940, 669 N.W.2d 780 (citing *Kotecki & Radtke, S.C. v. Johnson,* 192 Wis. 2d 429, 447, 531 N.W.2d 606 (Ct. App. 1995)). However, this discretion is not unlimited. The local rule may not conflict with a state statute. *Geneva Nat'l Cmty. Assoc., Inc. v. Friedman,* 228 Wis. 2d 572, 586–87 n.8, 598 N.W.2d 600 (Ct. App. 1999) (citing *Cmty. Newspapers, Inc. v. City of West Allis,* 158 Wis. 2d 28, 32–33, 461 N.W.2d 785 (Ct. App. 1990)). Similarly, the local rule may not conflict with the uniform judicial administrative rules promulgated by the supreme court. SCR 70.34 (1978). In some cases, local rules may even be preempted by common law doctrines. *Miller Brewing Co. v. DILHR,* 210 Wis. 2d 26, 36, 563 N.W.2d 460 (1997) (citing *Local 174, Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 104 (1962)).

¶ 76. Amid this array of authority, practitioners must remain cognizant of the occasionally significant variation between one county's local rules and another's. For example, in Milwaukee, as we have seen in this case, the jury fee must be paid within 30 days after the scheduling conference. Milwaukee Cty. Ct. R. 371. By contrast, in Sheboygan County, the jury fee must be paid at or before the scheduling conference. Sheboygan Cty. Ct. R. 206. In Waukesha County, the fee must be paid at or before the pre-trial conference. Waukesha Cty. Ct. R. 6.1. In Marinette County, the jury fee is payable at or before the scheduling or pre-trial conference, whichever comes first. Marinette Cty. Ct. R.

county, *available at* http://www.wisbar.org/AM/ Template.cfm? Section=Circuit_court_rules2 (last visited June 17, 2005).

207. Many other local rules do not reference any timetable for payment of the jury fee, apparently leaving such decisions entirely up to the discretion of individual circuit judges.

¶ 77. When numerous circuit courts create local rules to augment a statewide rule, it is nearly inevitable that the local rules will conflict with each other. For example, prior to 1992, Wis. Stat. § 802.08(2) ("Summary judgment") read in part: "The [summary judgment] motion shall be served at least 20 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits." In practice, this rule proved to be unfair because the nonmovant could serve opposing affidavits the day before the hearing, giving minimal notice and opportunity for the court and the movant to prepare. Because of this, "a plethora of local court rules resulted." Judicial Council Note, 1992, § 802.08, Stats. (citing *Cmty. Newspapers,* 158 Wis. 2d [at 32 n.3]). To provide a statewide remedy, this court acted by amending the rule to its current form: "Unless earlier times are specified in the scheduling order, the [summary judgment] motion shall be served at least 20 days before the time fixed for the hearing, and the adverse party shall serve opposing affidavits, if any, at least 5 days before the time fixed for the hearing." Wis. Stat. § 802.08(2).[7] The court made the change to "preclude such local rules and promote uniformity of practice." Judicial Council Note, 1992, § 802.08, Stats.

¶ 78. In my view, similar action is warranted here. Although the exact time set for payment of the jury fee may not be important, some reasonable "uniformity of

---

[7] *See* 168 Wis. 2d xxi (1992) (Wisconsin Supreme Court Order amending Wis. Stat. § (Rule) 802.08(2)).

practice" is. The court should consider a uniform rule to avoid allowing local rules governing payment of the jury fee to become a snare, trapping unwary litigants and depriving them of the right to a jury trial.

¶ 79. In this case, the jury trial fee was paid 11 days late but more than 15 months before trial. Although such minimal delay did not appear to prejudice any party's preparation for trial, the circuit court chose not to retroactively extend the time for filing. Appellate courts will normally uphold the circuit court's ruling in the enforcement of local rules. *See Kolupar v. Wilde Pontiac Cadillac, Inc.*, 2004 WI 112, ¶ 31, 275 Wis. 2d 1, 683 N.W.2d 58. I reluctantly concur in the majority's decision to do so in this case.

## B. Standard of Care

¶ 80. In any negligence case, the plaintiff must prove that the defendant breached a duty of care to the plaintiff. *See, e.g., Morden v. Cont'l AG*, 2000 WI 51, ¶ 45, 235 Wis. 2d 325, 611 N.W.2d 659. In a medical malpractice case, the plaintiff must provide expert testimony to establish the defendant's breach of the appropriate standard. *Olfe v. Gordon*, 93 Wis. 2d 173, 180, 286 N.W.2d 573 (1980).[8]

---

[8] The *Olfe* court said:

In medical malpractice actions, Wisconsin law generally requires the plaintiff to introduce expert testimony as to the standard of care and the defendant's departure from it. "Without such testimony the jury has no standard which enables it to determine whether the defendant failed to exercise the degree of care and skill required of him."

*Olfe v. Gordon*, 93 Wis. 2d 173, 180, 286 N.W.2d 573 (1980) (citing *Froh v. Milwaukee Medical Clinic, S. C.*, 85 Wis. 2d 308,

¶ 81. The circuit court's pretrial ruling in this case appeared to obviate the need for proof *as to the applicable standard of care.* In a letter to counsel for both sides, Judge Sullivan stated: "During [the time in question, Dr. Lindemann] assumed the mantle of a physician treating an obstetrical patient. Therefore, that must be the standard to which he is held." However, in the circuit court's "Conclusions of Law," Judge Sullivan wrote "the defendant, Dr. Matthew Lindemann was negligent in his care and treatment of Marlene Phelps and Adam Phelps under both the standard of care applicable to a first year resident and the standard of care determined to be applicable by this court in its decision dated November 27, 2002."

¶ 82. In a holding I fully join, the majority determines that the circuit court's initial decision was incorrect. Majority op., ¶¶ 43–47. Instead of adopting a "treating physician" standard, the circuit court should have used the standard of care applicable to an unlicensed first-year resident. *Id.,* ¶ 43. The majority opinion focuses on affirming the circuit court's findings that show "the ways in which Dr. Lindemann violated both standards of care." Majority op., ¶ 46. It reinforces the court's action with the conclusory comment that "To the extent the circuit court erred in applying the standard of care applicable to an average physician treating an obstetrical patient, we deem that error harmless." Majority op., ¶ 46 n.13.

¶ 83. I strongly disagree. The majority relies on the circuit court's post-hoc rationalization that Lindemann was negligent under either standard of care. It ignores the fact that the conduct of the trial would have

317, 270 N.W.2d 83 (Ct. App. 1978); *Francois v. Mokrohisky,* 67 Wis. 2d 196, 204, 226 N.W.2d 470 (1975)).

been different if the circuit court's original ruling had favored the standard of care applicable to an unlicensed first-year resident—the same standard the majority now recognizes as the proper one—instead of the standard applicable to an average physician treating an obstetrical patient.

¶ 84. The following examples illustrate the point. Dr. Dennis Worthington was one of Lindemann's supervisors in the obstetrics department at St. Joseph's. During his testimony at trial on December 5, 2002, Dr. Worthington had the following exchange with the plaintiffs' counsel:

> Q: . . . [D]id you reach a conclusion on whether or not Dr. Lindemann failed to meet the standard of care required of him at St. Joseph's Hospital?
>
> A: Yeah—I'm not sure that there is a definitive standard of care for—for interns that is—in terms of standard of care it—

At that point, the plaintiffs' counsel cut off the answer, saying "Doctor, maybe I can help you. The court has set what the standard is—." Defense counsel objected, asking that Dr. Worthington be allowed to answer the original question without clarification. The court refused, and allowed plaintiffs' counsel to "paraphrase" the question as follows:

> Q: Doctor, I'm going to read you this definition of medical negligence as decided by this court and ask you to accept this as the definition of negligence that applies to Dr. Lindemann. "In treating and diagnosing Marlene Phelps' condition, Dr. Matthew Lindemann was required to use the degree of care, skill and judgment which reasonable physicians who treat obstetrical patients would exercise in the same or similar circumstances having due regard for the state of medi-

cal science at the time the plaintiff was treated and diagnosed. A doctor who fails to conform to this standard is negligent." . . .

¶ 85. Perhaps realizing the problem, the circuit court took a different approach during the testimony of the plaintiffs' expert, Dr. David Acker, on December 10, 2002. After Acker testified that he believed Lindemann violated "the standard of care," the circuit judge intervened:

THE COURT: Now, let me ask you this question. Assuming—Let's assume the standard were different and the standard was that of a first year resident. What would your position be?

THE WITNESS: It's the same because [Lindemann was] not looking for the right diagnosis.

THE COURT: Sure.

THE WITNESS: I'm—everything that I've tried to describe—

THE COURT: [Lindemann] just needed to do something else.

THE WITNESS: That's it. You don't have to know what this is to do something else. And in fact, he knew what it was, pain not related to labor.

THE COURT: Sure.

¶ 86. As the trial advanced, the parties' understanding of the standard of care issue evolved, as evidenced by the following exchange during the direct examination of defense expert Dr. Frederik Broekhuizen:

Q: Doctor, *by way of an offer of proof* if the court believes this is an inappropriate question, based upon

115

your experience, would you expect a first-year resident, an intern, to meet the standard of care of an attending [physician]?

[PLAINTIFFS' ATTORNEY]: . . . I want to make sure that that is what is understood here. This is an offer of proof.

. . . .

THE COURT: I will allow it as an offer of proof. I made the ruling in the case and *that I'll have to live with,* and there's been a lot of testimony here so far what a first-year resident ought to be doing even from the plaintiffs' witnesses. So to a certain degree, let's hear what he has to say.

. . . .

Q: Doctor, assuming the standard of care applicable to Dr. Lindemann was that of a first-year resident in his second obstetric rotation, do you believe Dr. Lindemann met that standard of care in his care and treatment of Mrs. Phelps on the morning of 11/24/98?

A: I think he did. (Emphasis added.)

¶ 87. The above excerpts reveal the shifting sands that developed at trial, with the parties at different times proceeding under three different approaches as to the applicable standard of care: 1) the treating physician standard (Dr. Worthington's testimony); 2) the first-year resident standard (Dr. Broekhuizen's testimony); 3) both standards (Dr. Acker's testimony). At times, the court took over questioning the expert witnesses.

¶ 88. This uncertainty permeated the conduct of the trial. Therefore, I do not agree that the circuit court's error was harmless because the defendant was

116

not permitted to make a sustained case on what this court now deems the applicable standard of care. Because no jury was present, the court did not have to grapple with instructions forthrightly stating its view of the law.

¶ 89. Moreover, we cannot know how application of the correct standard would have altered the court's apportionment of damages. The court decided that Dr. Lindemann was 80 percent responsible and St. Joseph's was 20 percent responsible for the incident. Had the circuit court proceeded under the appropriate standard of care, it might have decided that St. Joseph's had a higher degree of culpability given its responsibility to supervise Dr. Lindemann. The degree of supervision expected of a hospital in its relationship with an unlicensed first-year resident is likely quite different from the degree of supervision expected of the same hospital in its relationship with an experienced physician.

¶ 90. In a trial to the court, all the participants should understand the rules of engagement. *See State v. Watkins*, 2002 WI 101, ¶ 81, 255 Wis. 2d 265, 647 N.W.2d 244.[9] In the absence of a jury, the circuit court must provide a "clear analysis of its thinking on the

---

[9] The *Watkins* court wrote in a criminal context, but the same fundamental principle applies here. We stated:

> When a case is tried to a jury, all the players—judge, jury, prosecutor, defense attorney, and defendant—should understand the parameters of the jury verdict. The preparation of jury instructions forces the parties to clarify the issues on the record and identify what charges and defenses may be considered by the jury. When a case is tried to the court, the court may reach the same conclusion a jury would reach but fail to articulate the operative legal principles for its decision.

*State v. Watkins*, 2002 WI 101, ¶ 81, 255 Wis. 2d 265, 647 N.W.2d 244.

legal issues" in the case. *Id.* Because the court did not do so in this case, the parties deserve another trial at which the applicable standard of care is clear.

## II

¶ 91. The majority concludes that Dr. Lindemann is not a health care provider, is not covered by chapter 655, is not covered by the Patients Compensation Fund, and is not subject to the medical malpractice damage caps. In so holding, the majority accepts the plaintiff's contention that "the noneconomic damage cap in § 655.017, as implemented through § 893.55(4), does not apply to a first-year unlicensed medical resident who is not covered by Chapter 655." I do not dispute that residents are not "health care providers" under a stringent interpretation of Wis. Stat. § 655.002. However, unlike the majority, I would hold that the circuit court's two rulings that Lindemann was not St. Joseph's "employee" were clearly erroneous findings of fact. Based on the facts in the record, I would hold that Lindemann was St. Joseph's "employee" as a matter of law.

¶ 92. Alternatively, to the extent that the circuit court's rulings could be considered discretionary decisions applying the facts of this case to the appropriate legal standard, I would hold that the two rulings were erroneous exercises of discretion because they reflect a complete absence of discretionary decision-making. *See Hess v. Fernandez,* 2005 WI 19, ¶ 12, 278 Wis. 2d 283, 692 N.W.2d 655 ("A court misused its discretion if the court failed to exercise its discretion, the facts do not support the court's decision, or the court applied the wrong legal standard.").

¶ 93. Prior to discussing the circuit court's determinations, it is essential to review the peculiar employment status of medical residents.

¶ 94. The employment status of medical residents is somewhat unusual. For purposes of analysis, the Medical College of Wisconsin (MCW) presently offers 83 residency and fellowship programs.[10] The doctors serving in these programs did not necessarily attend medical school at MCW; graduates of any medical school may apply for an MCW residency position.[11] Residents selected for one of these programs generally rotate through two or three of the Medical College's 14 affiliated hospitals.[12] For instance, in the Obstetrics & Gynecology program, residents rotate through three institutions: Froedtert Hospital, St. Joseph's Hospital, and Columbia-St. Mary's Hospital.[13]

¶ 95. To simplify the administration of these programs, the 14 affiliated hospitals formed The Medical College of Wisconsin Affiliated Hospitals (MCWAH), a nonprofit, charitable corporation exempt from federal income tax under § 501(c)(3) of the Internal Revenue Code. MCWAH's Executive Director, Dr. Mahendr Kochar, testified about MCWAH's nature and function. MCW provides funding to MCWAH for administrative and clerical services. The residents selected to serve at

---

[10] *See* http://www.mcw.edu/display/router.asp?docid=2422 (last visited June 17, 2005).

[11] Lindemann was never a student at the Medical College of Wisconsin (MCW). After his graduation from the University of North Dakota School of Medicine, he earned a position in MCW's Obstetrics & Gynecology residency program.

[12] *See* http://www.mcw.edu/display/router.asp?docid=2422 (last visited June 17, 2005).

[13] *See* http://www.mcw.edu/display/router.asp?docid=4010 (last visited June 17, 2005).

119

the 14 affiliated hospitals sign contracts with MCWAH,[14] and each of the affiliated hospitals contributes to MCWAH in order to fund the residents' salaries and benefits. In effect, "MCWAH simply takes funds provided by hospitals to pay the resident, deposits it into an account, and then issues a check to the resident." Dr. Kochar testified that MCWAH had no

> control of the residents at the various hospitals where they are placed. This is pursuant to agreements with the hospitals and in keeping with the original intent of the creation of MCWAH in 1980. MCWAH is, in essence a conduit to facilitate payments, and has no supervisory or control role over the residents.

The circuit court agreed when it granted partial summary judgment dismissing MCWAH from the case: "MCWAH did not control the performance of Dr. Lindemann's duties as a resident physician."

¶ 96. Having briefly delineated the general employment status of medical residents in the MCW program, I turn to the question of the applicability of chapter 655 and the medical malpractice damage caps to Dr. Lindemann. The majority opinion adopts the part of the court of appeals' decision remanding the cause "for a determination of whether Dr. Lindemann was a 'borrowed employee' of St. Joseph's Hospital and therefore entitled to the cap protection as an 'employee' of a health care provider under Wis. Stat. § 893.55(4)(b)." Majority op., ¶ 4. Both the majority and the court of appeals ignore the fact that the circuit court has already ruled on this issue twice. Both times, the circuit court determined that Dr. Lindemann was not an employee, and therefore not covered by the damage caps.

---

[14] As do all residents, Dr. Lindemann signed a contract with MCWAH.

¶ 97. This issue arose for the first time as a result of the plaintiffs' motion for declaratory judgment as to the applicability of chapter 655 to the case. The defendants, in a brief opposing the plaintiffs' motion, argued that chapter 655 applied because Lindemann was a "de facto employee or agent of a hospital or a borrowed employee of the attending physician . . . . " *See* Wis. Stat. § 655.005.[15] The defendants' argument on this point was nearly six pages in length, extensively discussing the applicable legal standards. The circuit court summarily dismissed these arguments in a decision letter. The court simply stated that it was "not persuaded that defendant Lindemann is entitled to the protection of Chapter 655 of the statutes . . . ." The court relied on the fact that Lindemann was not a "physician" as that term is defined in chapter 655; the decision letter never mentioned the defendants' argument that Lindemann was an "employee" of a health care provider, and therefore covered by chapter 655.

¶ 98. The defendants brought a motion for reconsideration, and again briefed and argued the "employee" issue to the court. In a one-sentence response to these arguments, the circuit court wrote, "Defendants' motion to reconsider the court's July 18, 2000 decision holding that Chapter 655 does not apply in this case is denied."

¶ 99. The court of appeals has held that whether MCWAH residents are employees of the hospitals at which they serve is a "factual issue." *Estate of Hegarty v.*

---

[15] "Any person . . . having a claim or a derivative claim against a health care provider or an employee of the health care provider, for damages for bodily injury or death due to acts or omissions of the employee of the health care provider acting within the scope of his or her employment and providing health care services, is subject to this chapter." Wis. Stat. § 655.005(1).

*Beauchaine,* 2001 WI App 300, ¶ 77, 249 Wis. 2d 142, 638 N.W.2d 355. As such, "[t]he trier of fact must determine whether [MCWAH] intended to relinquish control to the hospital, the attending physician, or someone else." *Id.,* ¶ 76.

¶ 100. We defer to the circuit court's findings of fact unless they are "clearly erroneous." *See, e.g., Schreiber v. Physicians Ins. Co. of Wis.,* 223 Wis. 2d 417, 426, 588 N.W.2d 26 (1999). However, the application of facts to a legal standard is a question of law subject to de novo review. *State v. Wills,* 193 Wis. 2d 273, 277, 533 N.W.2d 165 (1995). If there is both a disputed question of fact and a disputed question of law, this court should "first review the facts under a clearly erroneous standard of review and then determine [the question of law] under a de novo standard of review . . . ." *Id.* at 277–78. The circuit court was thus faced with a question of fact (whether MCWAH relinquished control of Lindemann to St. Joseph's) and a question of law (whether Lindemann became St. Joseph's "borrowed employee").

¶ 101. In *Hegarty,* a lengthy, well-reasoned opinion, the court of appeals discussed *precisely* the same issue—namely, whether a resident directly employed by MCWAH is a "borrowed employee" of the hospital at which the resident serves at the time of the alleged malpractice. *Hegarty,* 249 Wis. 2d 142, ¶¶ 57–78. In that case, it was undisputed that residents associated with MCWAH are "employees" of MCWAH in the general sense, as the circuit court also found in this case.[16] *Id.,* ¶ 58.

¶ 102. As the *Hegarty* court recognized, the more difficult question is whether the residents are also "borrowed employees" of the hospitals at which they

---

[16] *See* Findings of Fact, #11.

serve. The critical issue is who "control[led]" the residents' activities. *Id.,* ¶ 61 (citing *Pamperin v. Trinity Mem'l Hosp.,* 144 Wis. 2d 188, 199, 423 N.W.2d 848 (1988) ("The right to control is the dominant test in determining whether an individual is a servant.")). To answer this question, the court of appeals adopted a test we developed in *Seaman Body Corp. v. Industrial Commission,* 204 Wis. 157, 235 N.W. 433 (1931):

> The relation of employer and employee exists as between a special employer to whom an employee is loaned whenever the following facts concur: (a) Consent on the part of the employee to work for a special employer; (b) Actual entry by the employee upon the work of and for the special employer pursuant to an express or implied contract so to do; (c) Power of the special employer to control the details of the work to be performed and to determine how the work shall be done and whether it shall stop or continue.

*Hegarty,* 249 Wis.2d 142, ¶ 68 (citing *Seaman,* 204 Wis. at 163).

¶ 103. Under *Seaman,* there is a presumption that,

> [i]n the absence of evidence to the contrary, . . . the actor remains in his [or her] general employment so long as, by the service rendered another, he [or she] is performing the business entrusted to him [or her] by the general employer. There is no inference that because the general employer has permitted a division of control, [the employer] has surrendered it.

*Id.,* ¶ 69 (citing *Borneman v. Corwyn Transp.,* 212 Wis. 2d 25, 43–44, 567 N.W.2d 887 (Ct. App. 1997)). MCWAH therefore had to overcome this presumption with evidence that "it relinquished full control of its servant." *Id.,* ¶¶ 70–71.

¶ 104. In *Hegarty*, the court of appeals determined that whether MCWAH had "relinquished full control" of the resident was a factual determination to be resolved by the circuit court. It therefore remanded to allow that court to answer the following two questions: "(1) at any time, was [the resident] a servant of [MCWAH], i.e., was she employed by [MCWAH] and was she subject to [MCWAH's] control or right to control; and, if so (2) did [MCWAH] loan [the resident] to another and surrender the right to control [the resident] to that other institution or person?" *Id.*, ¶ 78. The circuit court should have asked—and answered—the same questions in this case in response to the plaintiffs' motion for declaratory judgment as to the applicability of chapter 655 and the defendants' subsequent motion for reconsideration.

¶ 105. Additionally, the circuit court could have considered the *plaintiffs*' pretrial brief in support of a motion for declaratory judgment, in which the plaintiffs convincingly argued that Lindemann "was an employee or actual agent of St. Joseph's." As the plaintiffs noted in that filing, the following facts are undisputed: (1) St. Joseph's fully reimbursed MCWAH for Lindemann's stipends, costs, expenses, and other benefits; (2) Lindemann was required to comply with the policies and procedures of St. Joseph's; (3) Lindemann testified that St. Joseph's had the right to control his day-to-day activities at the hospital; and (4) St. Joseph's provided its residents with free meals, free parking, free laundry services, discounts in the cafeteria, use of the hospital's scrub outfits, use of a room to rest in, and funding for educational conferences.

¶ 106. This argument was consistent with the plaintiffs' earlier filings. In their original complaint, filed September 30, 1999, the plaintiffs named the Patients Compensation Fund as a defendant and alleged that the Fund

is a mandatory health care liability risk sharing plan *created by Chapter 655* ... whose obligations and responsibilities include making payments in excess of underlying insurance limits *on behalf of negligent health care providers in the State of Wisconsin, including* ... any individual acting with real or apparent authority of St. Joseph's Hospital of Franciscan Sisters, Milwaukee, Inc. *including, but not limited to, Matthew Lindemann, M.D.* ...

(Emphasis added.)

¶ 107. The plaintiffs also indicated their intent to file a medical mediation request "pursuant to Chapter 655 of the Wisconsin Statutes . . . ." The plaintiffs reiterated the claim that Lindemann was an "agent, servant, and/or employee" of St. Joseph's no less than nine times in the complaint.

¶ 108. The plaintiffs filed an amended summons and complaint April 14, 2000. In the amended complaint, the plaintiffs named as additional defendants the Medical College of Wisconsin Affiliated Hospital (MCWAH), its insurer, Physicians Insurance Company of Wisconsin (PIC), and Lindemann, as an individual. The amended complaint alleged that chapter 655 did not apply to Lindemann, but continued to name the Fund as a defendant. While now alleging that "MCWAH was the employer of the defendant, Matthew Lindemann, M.D.," the Phelpses repeatedly alleged that Lindemann was an "agent, servant, and/or employee" of St. Joseph's, or alternatively an "individual over whom St. Joseph's had supervisory control and responsibility with respect to medical care provided to patients . . . ."

¶ 109. In a response to interrogatories dated May 31, 2000, MCWAH admitted both that "[MCWAH] was the employer of Matthew Lindemann on November 24, 1998" and that "St. Joseph's Hospital of Franciscan

125

Sisters, Milwaukee, Inc. was the de facto employer of Matthew Lindemann on November 24, 1998." In a separate response, St. Joseph's admitted that MCWAH was Lindemann's employer, but denied that St. Joseph's was Lindemann's de facto employer.

¶ 110. In time, the circuit court recognized that, "MCWAH did not control the performance of Dr. Lindemann's duties as a resident physician." Accordingly, MCWAH could not be held liable under the doctrine of respondeat superior, and the circuit court granted its motion for summary judgment on November 14, 2000.

¶ 111. Given all these facts and both sides' arguments, it is hard to imagine how Lindemann does not qualify as St. Joseph's "employee." St. Joseph's self-serving argument that it was not Lindemann's de facto employer is difficult to square with the realities of the situation. The absence of a finding that Lindemann was St. Joseph's "employee" means that medical residents are effectively the only workers in a hospital not covered by the damage caps, despite the fact that as new doctors, they are perhaps most in need of the protections in chapter 655. The Legislature could not have intended such a restrictive definition of "employee" in this context.

¶ 112. I conclude that the circuit court's initial decision that chapter 655 did not apply, and its denial of the defendants' motion for reconsideration, effectively means that it found that Lindemann was not St. Joseph's employee. The decision therefore implicitly contained both a clearly erroneous finding of fact (that MCWAH did not relinquish control of Lindemann to St. Joseph's) and an incorrect conclusion of law (that Lindemann was not St. Joseph's "borrowed employee"). I would reverse the circuit court's decision on this issue,

and hold as a matter of law that Lindemann is subject to chapter 655 because he is an "employee" of a health care provider, St. Joseph's Hospital. *See* Wis. Stat. §§ 655.005, 655.017, 893.55(4)(b).

¶ 113. Alternatively, to the extent the circuit court's rulings on this issue were discretionary decisions, they should also be reversed. In my view, the circuit court did not exercise any discretion at all. This court has often written that "discretion 'is not the equivalent of unfettered decision-making.' " *Split Rock Hardwoods, Inc. v. Lumber Liquidators, Inc.,* 2002 WI 66, ¶ 65, 253 Wis.2d 238, 646 N.W.2d 19 (citing *Hartung v. Hartung,* 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981)). As we have explained,

> "A discretionary determination, to be sustained, must demonstrably be made and based upon the facts appearing in the record and in reliance on the appropriate and applicable law." *Hartung,* 102 Wis. 2d at 66. In *Howard v. Duersten ,* the court stated: "The trial court must undertake a reasonable inquiry and examination of the facts as the basis of its decision. The exercise of discretion must depend on facts that are of record or that are reasonably derived by inference from the record and *the basis [of that] exercise of discretion should be set forth .*" *Howard v. Duersten,* 81 Wis.2d 301, 305, 260 N.W.2d 274 (1977) (emphasis added). As the *Hartung* court put it, "[A] discretionary determination must be the product of a rational mental process by which *the facts of record and law relied upon are stated and are considered together* for the purpose of achieving a reasoned and reasonable determination." *Hartung ,* 102 Wis.2d at 66 (emphasis added). In reviewing these discretionary determinations, an appellate court should not be expected to read the mind of the trial judge.

*Split Rock Hardwoods,* 253 Wis. 2d 238, ¶ 65.

¶ 114. The circuit court's conclusory rulings on this issue do not satisfy this test, and should be vacated. Upon remand, the circuit court should not simply rely on its prior rulings in this regard because those rulings reflect a complete absence of any exercise of discretion. Instead, on remand, the circuit court should apply the facts and arguments described above to determine whether Lindemann qualified for cap protection as a "borrowed employee" of St. Joseph's under the standards described above.

## III

¶ 115. Finally, I question whether the circuit court's award of $200,000 to Gregory Phelps, the father, for negligent infliction of emotional distress is warranted under our decision in *Pierce*. In that case, we allowed a mother of a stillborn to raise such a claim based on the mother's unique status as both "a participant, and a victim of the actionable conduct—medical malpractice—that gave rise to her claim." *Pierce,* 278 Wis. 2d 82, ¶¶ 13, 15.

¶ 116. The majority chooses not to address the impact of *Pierce,* because "such issues were not briefed or argued by the parties." Majority op., ¶ 21 n.6. It should be noted that by letter dated March 30, 2004, Dr. Lindemann asked the court of appeals to delay its decision, pending this court's resolution of *Pierce* and *Maurin v. Hall,* 2004 WI 100, 274 Wis. 2d 28, 682 N.W.2d 866. *Phelps,* 273 Wis. 2d 667, ¶ 50 n.11. The court declined to do so, but allowed that, "[a]lthough the *Pierce* decision may impact this case, its application *vel non* will depend on the facts adduced at the trial on remand." *Id.*

¶ 117. Because of this court's decision, there will be no trial on remand. However, Dr. Lindemann will be

permitted to argue that he qualified as an employee of a health care provider, and therefore is entitled to the benefits of chapter 655. He should also be allowed to argue the *Pierce* issue, as the court of appeals envisioned.

¶ 118. If the circuit court's award to Gregory Phelps stands, it represents a dramatic expansion of the scope of delivery room "bystander" claims in Wisconsin. Gregory was not a "participant" in the medical malpractice, as was the plaintiff in *Pierce*. However, the issue involves questions of fact not briefed to us, perhaps because the parties believed that (pursuant to the court of appeals' opinion) they would have the opportunity to argue the issue on remand. I would allow both sides to do so.

¶ 119. For the foregoing reasons, I respectfully concur in part and dissent in part.

¶ 120. I am authorized to state that Justice PATIENCE DRAKE ROGGENSACK joins this opinion.